Exhibit 'C'

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF TEXAS

SAN ANTONIO


MELODY JOY CANTU AND DR.
RODRIGO CANTU,

   Plaintiffs,

v.         5:20-CV-0746JKP-HJB

DR. SANDRA GUERRA AND DIGITAL
FORENSICS CORPORATION, LLC,

   Defendants.




  The Videotape Deposition of SANDRA GUERRA, taken
at the request of the Plaintiffs, before Truenea
Teasley, CSR in the State of Texas, pursuant to Federal
Rules of Civil Procedure, on Thursday, July 21, 2022,
from 10:02 a.m. to 1:30 p.m., at 755 East Mulberry
Avenue, Suite 250, San Antonio, Texas 78212, conducted
remotely.

Page 2

1                    A P P E A R A N C E S

2    For the Plaintiffs (Remotely):

3          Tor Ekeland
           Tor Ekeland Law, PLLC
4          30 Wall Street, 8th Floor
           New York, New York 10005
5          tor@torekeland.com

6

7    For the Defendant (Remotely):

8          Brandy Peery
           Cedillo & Mendoza, Inc.
9          755 East Mulberry, Suite 250
           San Antonio, Texas 78212
10         beery@lawdcm.com

11   ALSO PRESENT:

12         Liz Kemp, Videographer
           Melody Cantu
13         Nicole Guitelman

14

15

16                    I N D E X

17   WITNESS:                                          PAGE

18   SANDRA GUERRA, M.D.

19         Examination by MR. EKELAND                    4

20   CHANGES AND SIGNATURE PAGE                        110

21   Certificate of Completion of Deposition           111

22

23

24

25

Page 3

| | EXHIBITS: | DESCRIPTION | PAGE |
|---|---|---|---|
| 1 | | | |
| 2 | Exhibit A | Notice of Deposition | 5 |
| 3 | Exhibit C | Service Authorization Agreement | 6 |
| 4 | Exhibit D | Wire Transfer | 27 |
| 5 | Exhibit E | Phase I Report | 27 |
| 6 | Exhibit F | Table of Messages | 50 |
| 7 | Exhibit J | Motion for Enforcement | 52 |
| 8 | Exhibit N | Letter Dated 06-01-2018 | 53 |
| 9 | Exhibit I-A | Investigation Report | 58 |
| 10 | Exhibit K-A | E-mail | 61 |
| 11 | Exhibit M | Police Report | 63 |
| 12 | Exhibit R | News Article | 70 |
| 13 | Exhibit K | Letter Dated 09-25-2019 | 77 |
| 14 | Exhibit T | Request for Production | 79 |

15

16

17

18

19

20

21

22

23

24

25

1          VIDEOGRAPHER:  We're now on the video

2    record at the beginning of media file number 1.  The

3    time is 10:02 a.m.

4          Would the court reporter please swear in

5    the witness.

6                    SANDRA GUERRA, M.D.

7    sworn by the Certified Court Reporter, testified as

8    follows:

9                      EXAMINATION

10   BY MR. EKELAND:

11        Q.   Good morning, Dr. Guerra.

12        A.   Good morning.

13        Q.   As you know I'm Tor Ekeland and I represent

14   the plaintiffs, Dr. Cantu and Mrs. Cantu.  Just to

15   start, I'm going to ask the normal questions.

16          Have you -- are you under the influence

17   of any drugs, medication or anything else that would

18   affect your ability to testify truthfully today?

19        A.   No.

20        Q.   Do you have any chat windows or phones nearby

21   where you can text people or communicate with anybody,

22   the attorneys or anybody like that?

23        A.   No.

24        Q.   And who is in the room with you?

25        A.   No one.

1      Q.    And you've testified in depositions before.

2    Correct?

3      A.    Yes.

4      Q.    How many times?

5      A.    One.

6      Q.    And that was -- that one time you testified,

7    that was in relation to a custody case with Dr. Cantu.

8    Correct?

9      A.    Yes.

10                MR. EKELAND:  If I could get Exhibit A

11   up.

12                (Exhibit A was marked.)

13     Q.   (BY MR. EKELAND)  Dr. Guerra, can you see

14   Exhibit A?

15     A.    I can.

16     Q.    Okay.  Just after you've kind of looked at the

17   first page, just let us know and we'll go to the second

18   page.

19     A.    I have read the first page.

20                MR. EKELAND:  If I could get the second

21   page, please.

22     Q.   (BY MR. EKELAND)  Just take a look at that and

23   let me know when you're done.

24     A.    I read it.

25     Q.    And this is your notice of deposition for your

1  testimony today.  Correct?

2      A.   Yes.

3                MR. EKELAND:  If I could get Exhibit C,

4  please.

5                (Exhibit C was marked.)

6      Q.   (BY MR. EKELAND)  Just take -- you can see

7  Exhibit C?

8      A.   Yes.

9      Q.   And do you recognize it?

10      A.   I can tell what it is.  I don't recall it.

11      Q.   And this is the front page to your agreement

12  with Digital Forensic Corporation.  Correct?

13      A.   Yes.

14      Q.   And down in the bottom right-hand corner where

15  it says total, it says $3,000.

16                Do you see that?

17      A.   Yes.

18      Q.   And that's $3,000 you paid to Digital

19  Forensics Corporation.  Correct?

20      A.   Yes.

21      Q.   And you paid them that money to investigate

22  Melody Joy Cantu.  Correct?

23                MS. PEERY:  Objection to the form.

24      A.   Not correct.

25      Q.   (BY MR. EKELAND)  Why did you pay them that

1  money?

2      A.   To do an investigation on who was attempting

3  to hack me and sign me up on accounts without my

4  authorization.

5      Q.   And you communicated that desire to Digital

6  Forensics Corporation?

7      A.   Yes.

8      Q.   And you communicated with them via e-mail?

9           MS. PEERY:  Objection, form.

10          MR. EKELAND:  I couldn't hear that

11  objection.  I'm sorry.  That was real soft.

12          MS. PEERY:  Objection, form.

13     Q.   (BY MR. EKELAND)  You can answer.

14     A.   I do not recall e-mailing with Digital

15  Forensics.

16     Q.   In response to our discovery requests, did you

17  do a search of your e-mail?

18     A.   I have.

19     Q.   And did you find any communications with

20  Digital Forensics Corporation?

21          MS. PEERY:  Objection, form.

22     Q.   (BY MR. EKELAND)  You can answer.

23     A.   No.

24     Q.   What else did you search in response to our

25  discovery requests in this case?

1          MS. PEERY:  Objection, form.

2     Q.   (BY MR. EKELAND)  You can answer.

3     A.   Please clarify your question.

4     Q.   Okay.  So you saw our discovery requests in

5 this case?

6     A.   Yes.

7     Q.   And when you got those discovery requests, you

8 did a search for information that was responsive to

9 those discovery requests?

10          MS. PEERY:  Objection, form.

11     Q.   (BY MR. EKELAND)  You can answer.

12     A.   Yes.  That search has just started, but yes.

13     Q.   The search has just started.  Is that what you

14 just said?

15          MS. PEERY:  Objection, form.

16     A.   Correct.

17     Q.   (BY MR. EKELAND)  And when did you start that

18 search?

19          MS. PEERY:  Objection, form.

20     A.   In the last several days.

21     Q.   (BY MR. EKELAND)  And what have you searched

22 in the last several days?

23          MS. PEERY:  Objection, form.

24     Q.   (BY MR. EKELAND)  You can answer.

25     A.   For any e-mail communications between myself

Page 9

1   and Digital Forensics.

2       Q.   Did you look for texts between you and Digital

3   Forensics?

4                MS. PEERY:  Objection, form.

5       A.   I did not.

6       Q.   (BY MR. EKELAND)  Did you check your phone

7   records for records of calls with Digital Forensics?

8                MS. PEERY:  Objection, form.

9       A.   I did not.

10      Q.   (BY MR. EKELAND)  Do you recall at all how you

11  communicated with Digital Forensics?

12      A.   I do.

13      Q.   How did you communicate with Digital

14  Forensics?

15      A.   Through phone calls.

16      Q.   So directing your attention again to

17  Exhibit C -- which has disappeared from my screen -- do

18  you see up at the top there on the top left-hand side

19  where it says DocuSign Envelope ID?

20      A.   I do see that.

21      Q.   This agreement was sent to you via e-mail --

22  well, actually a link in an e-mail through DocuSign.

23  Correct?

24                MS. PEERY:  Objection, form.

25      Q.   (BY MR. EKELAND)  You can answer.

1    A.    I believe so.

2    Q.    Have you looked for this e-mail?

3    A.    I have.

4    Q.    Do you still have this e-mail?

5    A.    I do not recall.  I have not found it.

6    Q.    What e-mail service provider were you using at

7    the time when all of this happened?

8              MS. PEERY:  Objection, form.

9    Q.    (BY MR. EKELAND)  You can answer.

10   A.    I don't think I understand the question.

11   Q.    Okay.  Were you -- did you have a work e-mail

12   account at this time?

13             MS. PEERY:  Objection, form.

14   A.    It is likely I had a work e-mail account at

15   that time.

16   Q.    (BY MR. EKELAND)  Do you know what that

17   account was?

18   A.    It was tied to my employer.

19   Q.    Do you know what the e-mail address was?

20   A.    I could likely find it.  I don't remember it

21   at the moment.

22   Q.    That's fair.

23             And at the time, also, did you have any

24   personal e-mail accounts?

25   A.    I did.

1    Q.   Can you tell me the addresses of those

2  personal e-mail accounts.

3    A.   My -- the one I recall is the one I continue

4  to use today which is drsandraguerra@yahoo.com.

5    Q.   And if we asked you to go back and look and

6  find -- look for other personal e-mail accounts, you'd

7  do that for us.  Correct?

8              MS. PEERY:  Objection, form.

9    A.   Yes.  Yes.

10              MR. EKELAND:  If we could go to the next

11  page in Exhibit C, please.

12    Q.   (BY MR. EKELAND)  Directing your attention to

13  about the one, two -- the sixth paragraph down that

14  says Services Quote.

15              Can you see that?

16    A.   I can.

17    Q.   Do you see how it says:  Company provides

18  turnaround times to clients for purposes of providing

19  good faith estimates as to the hours necessary to

20  complete services based on previous experience in

21  handling similar matters.

22              Do you know if you ever received this

23  services quote from Digital Forensics Corporation?

24              MS. PEERY:  Objection, form.

25    Q.   (BY MR. EKELAND)  You can answer.

1      A.   No.

2      Q.   Have you searched your e-mail for a services

3  quote?

4           MS. PEERY:  Objection, form.

5      Q.   (BY MR. EKELAND)  You can answer.

6      A.   I have searched my e-mail for e-mail

7  communications between myself and Digital Forensics.

8      Q.   And what e-mail were you searching actually

9  when you did that?  What e-mail account?  I'm sorry.

10     A.   My personal Yahoo account.

11     Q.   Directing your attention to the paragraph

12  underneath the services quote paragraph that has the

13  price quote at the start of it.  Just take a look at

14  that and let me know when you're done with that.

15     A.   I have read it.

16     Q.   Do you know if you ever got a price quote from

17  Digital Forensics Corporation?

18     A.   I do not.

19     Q.   You searched your -- have you searched your

20  e-mail for a price quote from Digital Forensics?

21           MS. PEERY:  Objection, form.

22     A.   I have searched my e-mail for any e-mail

23  communication between myself and Digital Forensics.

24     Q.   (BY MR. EKELAND)  Do you remember who you were

25  communicating with at Digital Forensics?

Page 13

1     A.    I do not.

2     Q.    Do you remember if it was more than one

3  person?

4     A.    It was.

5     Q.    Do you remember how many people you

6  communicated with at Digital Forensics?

7     A.    I do not.

8     Q.    Directing your attention to the next paragraph

9  which has the bold lead saying About the Phase I

10  Service, just take a look at that and let me know when

11  you're done with it.

12     A.    I cannot read the entirety of the statement,

13  it is cut off on the right-hand side.

14     Q.    Apologies.  We'll fix that.

15     A.    Thank you.

16              I have read it.

17     Q.    And you see how it says:  Company utilizes a

18  two-phase procedure when performing a digital forensic

19  examination on the electronic devices obtained by the

20  client.

21              Do you know what that two-phase procedure

22  is?

23              MS. PEERY:  Objection, form.

24     Q.    (BY MR. EKELAND)  You can answer.

25     A.    I do not.

1    Q.   Did you turn over any devices to Digital

2  Forensic [sic] Corporation?

3              MS. PEERY:  Objection, form.

4    A.   I did not.

5              Thank you.

6              I did not.

7    Q.   (BY MR. EKELAND)  Have you turned or did you

8  turn over any of your electronic devices to any other

9  computer forensic examination company --

10             MS. PEERY:  Objection, form.

11   Q.   (BY MR. EKELAND)  -- in relation to this case?

12   A.   I did not.

13   Q.   Have you had your smartphone or any of your

14  devices imagined or copied in any way --

15             MS. PEERY:  Objection, form.

16   Q.   (BY MR. EKELAND)  -- in relation to this case?

17   A.   Yes.

18   Q.   Who -- what precisely was done?  Were they

19  imagined?

20             MS. PEERY:  Objection, form.

21   A.   I do not believe it was imaging, but I am not

22  sure.

23   Q.   (BY MR. EKELAND)  And who performed the work?

24   A.   Digital Forensics.

25   Q.   And what were they performing -- what device

1   were they are performing the work on?

2                    MS. PEERY:  Objection, form.

3        Q.   (BY MR. EKELAND)  You can answer.

4        A.   My laptop computer.

5        Q.   And is it correct to say that you shipped your

6   laptop computer to Digital Forensics for examination?

7                    Is that correct?

8        A.   It is not.

9        Q.   Why did you send your laptop computer to

10  Digital Forensics?

11                   MS. PEERY:  Objection, form.

12       A.   I not ship my laptop computer to Digital

13  Forensics.

14       Q.   (BY MR. EKELAND)  Did Digital Forensics

15  Corporation access your laptop computer remotely?

16       A.   Yes.

17       Q.   And what was your understanding of what

18  Digital Forensics Corporation was doing when they

19  remotely accessed your laptop?

20                   MS. PEERY:  Objection, form.

21       Q.   (BY MR. EKELAND)  You can answer.

22       A.   They were examining accounts that I had on

23  that computer.

24       Q.   And do you know if Digital Forensics

25  Corporation generated any kind of report or any kind of

1  written material in relation to the work that they did

2  for you?

3         MS. PEERY:  Objection, form.

4    Q.   (BY MR. EKELAND)  You can answer.

5    A.   I received a Phase I report.

6    Q.   Anything else?

7    A.   No.

8    Q.   Was the $3,000 that you just testified that

9  you paid to Digital Forensics Corporation, did that

10 $3,000 pay for the work on your laptop as well?

11        MS. PEERY:  Objection, form.

12   A.   The services that were provided by Digital

13 Forensics were included in those $3,000.

14   Q.   (BY MR. EKELAND)  Have you paid any other

15 money to Digital Forensic Corporation besides those

16 $3,000?

17   A.   I have not.

18   Q.   Now, the laptop that you just mentioned that

19 you had Digital Forensic Corporation remotely access,

20 what kind of laptop was that?

21   A.   A Dell.

22   Q.   Do you know the particular brand of Dell, type

23 of Dell?

24        MS. PEERY:  Objection, form.

25   A.   I'd like to correct it.  Actually it was an

1 HP.  That's all I know of it.

2     Q.   (BY MR. EKELAND)  Do you know what color it

3 is?

4     A.   A metallic brownish color.

5     Q.   Have you put any markings or stickers or

6 anything else on it?

7     A.   No.

8     Q.   Do you know how big the screen is?

9     A.   No.

10    Q.   And I believe you testified that you're asking

11 DFC -- short for Digital Forensic Corporation -- to you

12 said analyze accounts that were on your laptop.  Is

13 that correct?  Did I hear that?

14          MS. PEERY:  Objection, form.

15    Q.   (BY MR. EKELAND)  You can answer.

16    A.   Yes.

17    Q.   Can you name those accounts for me.

18          MS. PEERY:  Objection, form.

19    A.   My recollection is that they investigated my

20 LinkedIn account, my Facebook account.  And that is the

21 extent of what I recall.

22    Q.   (BY MR. EKELAND)  Did DFC access any other of

23 your devices remotely?

24          MS. PEERY:  Objection, form.

25    A.   No, not that I can recall.

1    Q.   (BY MR. EKELAND)  Are you aware of any other

2    devices besides the laptop that we just talked about

3    that DFC examined in any way, whether remotely, whether

4    you sent it to them, whether somebody came to your

5    place and looked at them, were any other devices here

6    that DFC examined?

7              MS. PEERY:  Objection, form.

8    A.   No.

9    Q.   (BY MR. EKELAND)  Are you aware of any other

10   work performed on your behalf by Digital Forensics

11   Corporation that is not mentioned in the Phase I

12   report?

13             MS. PEERY:  Objection, form.

14   A.   No.

15   Q.   (BY MR. EKELAND)  And are you aware of any

16   work performed outside the scope of your agreement with

17   Digital Forensics Corporation?

18             MS. PEERY:  Objection, form.

19   A.   No.

20   Q.   (BY MR. EKELAND)  And if I recall your

21   testimony correctly, DFC is the only computer forensics

22   corporation company that you've worked with in relation

23   to this matter?

24   A.   Yes.

25   Q.   Directing your attention to -- we're back on

1   Exhibit C, and the second paragraph up from the bottom

2   where it starts "This thorough process."

3       A.   I have read it.

4       Q.   Can you see how it says:  This thorough

5   process helps the client make an informed decision as

6   to whether to proceed with Phase II services.

7       A.   I do see that.

8       Q.   You -- did you ask DFC to proceed with Phase

9   II services?

10      A.   I did not.

11              MR. EKELAND:  Let's go to the next page,

12  please.

13      Q.   (BY MR. EKELAND)  Dr. Guerra, I forgot to say

14  at the top, if at any point, you want to take a break

15  or anything, just let us know and that's totally fine.

16              Going to the -- taking your attention to

17  the paragraph in the middle of the page that has the

18  bold lead saying "Secure Cell Phone Service."

19      A.   I read the statement.

20      Q.   My question is simple.  Did they provide you

21  with a secure cell phone?

22      A.   Not that I can recall.

23      Q.   I'd like to direct your attention to the -- is

24  it the second paragraph up from the bottom that has the

25  bold lead saying "Third-Party Services."

1        A.    I have read the statement.

2        Q.    Are you aware of any third-party services used

3    by DFC in relation to this matter?

4                  MS. PEERY:  Objection, form.

5        Q.    (BY MR. EKELAND)  You can answer.

6        A.    No.

7        Q.    Directing your attention to the last paragraph

8    on the page, it's inset starting:  Clients are not

9    obligated to use.

10       A.    I have read the statement.

11       Q.    Did DFC refer a private investigator to you?

12       A.    No.

13       Q.    Have you used a private investigator in

14   relation to this matter?

15       A.    Yes.

16                 MS. PEERY:  Objection, form.

17       A.    Yes.

18       Q.    (BY MR. EKELAND)  Who's the name of that

19   private -- what's the name of that private

20   investigator?

21       A.    I do not recall.

22       Q.    But you'd have that in your records?

23       A.    Yes.

24       Q.    And you paid them money for their services?

25       A.    Yes.

1     Q.     And you communicated with them via phone?

2     A.     Yes.

3     Q.     And you communicated with them in person?

4     A.     No.

5     Q.     But you communicated with them via e-mail?

6     A.     The report was sent by e-mail.

7     Q.     The private investigator sent you a report via

8  e-mail?

9     A.     Correct.

10    Q.     And what was that report on?

11               MS. PEERY:  Objection, form.

12               MR. EKELAND:  Withdrawn.

13    Q.     (BY MR. EKELAND)  What was that report about?

14               MS. PEERY:  Objection, form.

15    A.     Background on Melody Joy Cantu.

16    Q.     (BY MR. EKELAND)  Is that different from the

17  Detectives.com [sic] search that you did or is this

18  what you're referring to?

19    A.     It is what I am referring to.

20    Q.     Is it what we've just been talking about as

21  the Detectives.com search?

22    A.     Correct.  I don't recall the name of the

23  company but there was just one.

24    Q.     I think we'll be looking at it later.

25               So outside the Detectives.com search that

1  we were just talking about, did you hire or use any

2  other type of investigator in relation to this matter?

3      A.    No.

4      Q.    Have you hired or worked with anyone in

5  relation to this matter outside, obviously, your

6  attorneys, DFC and Detectives.com?

7              MS. PEERY:   Objection, form.

8      Q.    (BY MR. EKELAND)   You can answer.

9      A.    No.

10             MR. EKELAND:   If we could go to the next

11  page.

12             And about a third of the way up from the

13  bottom with the bold lead saying Storage Fees, if we

14  could blow up that sentence and the inset paragraph

15  underneath.  Well, I should start with the sentence and

16  Dr. Guerra can read that and then we'll go to the next

17  one.

18      A.    I have read the statement.

19             MR. EKELAND:   And then if we just blow up

20  the next paragraph underneath it.

21      A.    I have read the statement.

22      Q.    (BY MR. EKELAND)   Did you ever pay Digital

23  Forensics Corporation for data storage?

24      A.    I did not.

25      Q.    Did DFC copy the contents of the hard drive on

Page 23

1    your laptop, do you recall?

2                MS. PEERY:  Objection, form.

3        A.   I do not know.

4        Q.   (BY MR. EKELAND)  Did you ever ship anything,

5    you know, via mail, FedEx, UPS, any kind of shipping to

6    Digital Forensics Corporation?

7        A.   I cannot recall.

8        Q.   Do you recall them shipping you a cloning kit?

9                MS. PEERY:  Objection, form.

10       A.   I do recall receiving a package from Digital

11   Forensics which I recall opening and the device was

12   not -- what looked like, to me a noncomputer expert,

13   looked like an external hard drive, but it was broken.

14   It was not used.

15       Q.   (BY MR. EKELAND)  Did you -- did DFC send you

16   a working one?

17       A.   No.

18       Q.   Did you ask for a replacement?

19       A.   No.

20               MR. EKELAND:  If we could go to what's

21   page 5 of 10, on the bottom it's Bates stamped Guerra

22   000190.

23               There you go.

24               And up at the top if we could highlight

25   the first two paragraphs.

Page 24

1    A.   I have read the statement.

2    Q.   (BY MR. EKELAND)  And here they're talking

3  about the remote acquisition that they used to access

4  your laptop.  Correct?

5          MS. PEERY:  Objection, form.

6    Q.   (BY MR. EKELAND)  You can answer.

7    A.   This is describing a mechanism to access a

8  device.

9    Q.   And you have no reason to believe it's not the

10 mechanism, so to speak, that they used to access your

11 laptop.  Correct?

12         MS. PEERY:  Objection, form.

13   A.   Correct.

14   Q.   (BY MR. EKELAND)  Going down to the second to

15 last paragraph on this page that has the bold lead

16 saying GPS Tracking of Vehicles and Assets.

17   A.   I have read the statement.

18   Q.   Are you aware of any GPS tracking of vehicle

19 and/or assets in relation to this matter?

20   A.   No.

21         MR. EKELAND:  If we could go to the next

22 page and if we could go to -- it's the third paragraph

23 which has the bold lead Complaint Resolution Process.

24   A.   I have read the statement.

25   Q.   Did you ever make any complaints to DFC about

1    their services for you?

2                   MS. PEERY:  Objection, form.

3         Q.   (BY MR. EKELAND)  You can answer.

4         A.   I did not make any complaints.

5                   MR. EKELAND:  If we could go to page 8 of

6    10, which is the signature page.

7                   And if we could just highlight her

8    signature.

9         Q.   (BY MR. EKELAND)  That's your electronic

10   signature on this document.  Correct?

11        A.   I believe that it is.

12        Q.   And the date on that is May 25th, 2018.

13   Correct?

14        A.   Correct.

15                  MR. EKELAND:  If we could go to the next

16   page.

17                  And you see up at the top where it says

18   Consent to Search Form.  And if we could highlight the

19   second paragraph that has the bold lead Electronic

20   Media/Device.

21        A.   I have read the statement.

22        Q.   (BY MR. EKELAND)  And outside the laptop that

23   we discussed earlier, in relation to this paragraph --

24   withdraw.

25                  Outside of the laptop we talked earlier,

1  did DFC search any of your devices or perform any of

2  these services mentioned in that paragraph you just

3  read?

4             MS. PEERY:  Objection, form.

5     Q.   (BY MR. EKELAND)  You can answer.

6     A.   Not that I can recall.

7     Q.   Okay.  Going to the next paragraph which says

8  in the bold lead Internet Service Provider/Web-Based

9  Email Or Account.

10     A.   I have read the statement.

11     Q.   (BY MR. EKELAND)  Okay.  And it says:  I,

12  Sandra Guerra, authorize and provide my consent to

13  company to access, view, download, extract and report

14  on information contained in the Web-based accounts

15  submitted to company, including any electronic mail in

16  all folders, sent, received, trash, et cetera, stored

17  off site by the Internet service provider or Web-based

18  e-mail provider associated with the Web-based accounts.

19          Did DFC do what's described here for any

20  of your Web-based accounts?

21             MS. PEERY:  Objection, form.

22     Q.   (BY MR. EKELAND)  You can answer.

23     A.   I do not know.

24     Q.   Do you know if they searched your e-mail in

25  folders?

1          MS. PEERY:  Objection, form.

2     A.    I do not know.

3     Q.    (BY MR. EKELAND)  And then just directing your

4  attention to the bottom of the page at the signature

5  block.

6               That's your electronic signature on the

7  consent to search form?

8     A.    I believe that it is.

9     Q.    And it's dated May 25th, 2018.  Correct?

10    A.    It is.

11             MR. EKELAND:  Okay.  I'm done with the

12 exhibit.

13             (Exhibit D was marked.)

14             MR. EKELAND:  If I could get Exhibit D

15 up.

16    Q.    (BY MR. EKELAND)  And just please take a look

17 at that and let me know when you're ready.

18    A.    I have read what's in front of me.

19    Q.    And this is a wire transfer confirmation for

20 $3,000 that you sent to Digital Forensics Corporation.

21 Correct?

22    A.    That is what it appears to be.

23             (Exhibit E was marked.)

24             MR. EKELAND:  If I could get Exhibit E,

25 please.

1    Q.   (BY MR. EKELAND)  And if you would just take a

2  look at that and let me know when you're done.

3    A.   I do see that.

4    Q.   If you see something as we go through this

5  document that changes your mind, please let me know,

6  but this is the front page to the Phase I Report that

7  Digital Forensic Corporation sent to you.  Correct?

8    A.   That is correct.

9    Q.   Do you know who wrote this?

10    A.   I only know authorship of Digital Forensics

11  Corporation.

12    Q.   Did you speak with anyone while they were

13  writing the report about this report?

14    A.   Not that I can recall.

15            MR. EKELAND:  If we could go to page 5,

16  please.

17            If we could go to paragraph 4, please,

18  and blow it.

19    A.   I have read the statement.

20    Q.   (BY MR. EKELAND)  And so you see how it says:

21  If the client is interested in proceeding to Phase II,

22  the client needs to file a police report at the local

23  police station to document the cyber harassment or

24  cyber fraud.

25            Correct?

1       A.    That is what the statement states.

2       Q.    And in fact you did go down to the San Antonio

3   Police Department and filed a complaint, a police

4   report against Melody Joy Cantu.   Correct?

5                 MS. PEERY:   Objection, form.

6       A.    I did go to a police department and file a

7   complaint against Melody Joy Cantu.

8       Q.    (BY MR. EKELAND)   And when you did that, you

9   took a copy of this Phase I report with you.   Correct?

10                 MS. PEERY:   Objection, form.

11      A.    I did.

12      Q.    (BY MR. EKELAND)   And you told the San Antonio

13  Police Department that in order for you to get a

14  Phase II report, you had to file a police report.

15  Correct?

16                 MS. PEERY:   Objection, form.

17      A.    Correct.

18                 MR. EKELAND:   If we could go to page 25,

19  please.

20      Q.    (BY MR. EKELAND)   And just take a look at that

21  and let me know when you're ready.

22      A.    I have read the statement.

23      Q.    Directing your attention to the first

24  paragraph in the body of the text that starts:   I,

25  Dr. Sandra Guerra.

1       A.    I have read the statement.

2       Q.    Did you write that?

3       A.    I did not write that.

4       Q.    Directing your attention to the next paragraph

5  that says:  First beginning on or about May 16, 2018.

6       A.    I have read the statement.

7       Q.    Did you write that statement?

8             MS. PEERY:  Objection, form.

9       A.    I did not.

10      Q.    (BY MR. EKELAND)  Directing your attention to

11  the third paragraph in this sample police report.

12      A.    I have read the statement.

13      Q.    Did you write that statement?

14            MS. PEERY:  Objection, form.

15      A.    I did not write that statement.

16      Q.    (BY MR. EKELAND)  Directing your attention to

17  the last paragraph on the next page, I'm sorry, page

18  26.

19      A.    I have read the statement.

20      Q.    Did you write that statement?

21            MS. PEERY:  Objection, form.

22      A.    I did not write that statement.

23      Q.    (BY MR. EKELAND)  When you filed your police

24  report, did you use any of the language from what we

25  just went through in your police report?

1          MS. PEERY:  Objection, form.

2     Q.   (BY MR. EKELAND)  You can answer.

3     A.   I do not recall.

4          MR. EKELAND:  Can we go back to page 4 of

5  the Phase I report, please.

6     Q.   (BY MR. EKELAND)  Directing your attention to

7  paragraph 3.

8     A.   I have read the statement.

9     Q.   And so you see how it says:  Phase I also

10  includes the creation of tracking URLs to target at the

11  suspects.  The client will send the tracking URLs TO

12  suspects and Digital Forensics Corporation, DFC, will

13  monitor the tracking URLs for any activity by the

14  suspects.

15          And that's what happened.  Correct?

16          MS. PEERY:  Objection, form.

17     Q.   (BY MR. EKELAND)  You can answer.

18     A.   I do not know if that is what happened.

19     Q.   But you did send -- well, you did receive

20  tracking URLs from Digital Forensics Corporation.

21  Correct?

22          MS. PEERY:  Objection, form.

23     A.   I do not recall receiving tracking URLs from

24  Digital Forensics Corporation.

25     Q.   (BY MR. EKELAND)  Is it your testimony here

Page 32

1   today that you never sent any tracking URLs to

2   Melody Joy Cantu?

3                MS. PEERY:  Objection, form.

4        A.    That is correct.

5        Q.    (BY MR. EKELAND)  Do you know who did?

6                MS. PEERY:  Objection, form.

7        A.    I do not.

8        Q.    (BY MR. EKELAND)  You've read the Phase I

9   report.  Correct?

10       A.    Yes.

11       Q.    And you read it before you went to the

12  San Antonio Police Department.  Correct?

13       A.    Yes.

14       Q.    And just to be clear, it's your testimony here

15  today that Digital Forensics Corporation never sent you

16  any tracking URLs or tracking links of any type to

17  direct at plaintiffs?

18                MS. PEERY:  Objection, form.

19       A.    I do not recall receiving any tracking URLs

20  from DFC.

21                MR. EKELAND:  Let's go to the next page

22  and paragraph 6.

23                No.

24                VIDEOGRAPHER:  I'm sorry.  Did you say

25  paragraph 6?

1       MR. EKELAND:  No.  We can skip paragraph

2  6.

3       Let's go to page 7.

4  A.   I have read the statement.

5  Q.   (BY MR. EKELAND)  Did you see the table with

6  the -- having, you know, the date and the time and the

7  May 16th, May 18th and various dates?

8  A.   I do see the table.

9  Q.   That's based on information that you sent to

10  DFC?

11       MS. PEERY:  Objection, form.

12  A.   That is based on information that I provided

13  to DFC.

14  Q.   (BY MR. EKELAND)  And you e-mailed that

15  information to DFC?

16  A.   I believe it was -- so, no, it was not

17  e-mailed.

18  Q.   How did you convey that information to DFC?

19  A.   I believe it was through our conversation.

20  Q.   You orally listed all the information in the

21  table that we're talking about to DFC?

22       MS. PEERY:  Objection, form.

23  A.   It's difficult to recall exactly how, but yes,

24  I believe it was verbally.

25  Q.   (BY MR. EKELAND)  And where did you get this

1   information that you were verbally communicating to

2   DFC?

3             MS. PEERY:  Objection, form.

4     A.   I had received text messages from Verizon

5   informing me that someone was attempting to access my

6   account.  Therefore, I had those messages.

7     Q.   (BY MR. EKELAND)  And have you produced those

8   text messages to us?

9     A.   I do not know.

10     Q.   But you still have them.

11     A.   I do not know.

12     Q.   Because you haven't searched for them yet?

13     A.   That is correct, I have not searched for them.

14     Q.   But if we asked you to search for all the

15   information you have in relation to this,

16   quote/unquote, unknown malicious hacker, you would do

17   that.  Correct?

18             MS. PEERY:  Objection, form.

19     A.   Yes.

20     Q.   (BY MR. EKELAND)  If we could just go to the

21   last paragraph on this page.

22     A.   I have read the statement.

23     Q.   So am I correct to understand that what

24   happened here is that there were a large number of

25   attempted log-ins to your voice mail account.  Is that

Page 35

1    correct?

2                    MS. PEERY:  Objection, form.

3        A.   Yes.

4        Q.   (BY MR. EKELAND)  And as a result Verizon shut

5    down access to your voice mail account.  Is that

6    correct?

7                    MS. PEERY:  Objection, form.

8        A.   Yes.

9        Q.   (BY MR. EKELAND)  But you never lost your

10   phone service.  Correct?

11                   MS. PEERY:  Objection, form.

12       A.   I did not lose access to my phone, but I did

13   lose access to online access to my account.

14       Q.   (BY MR. EKELAND)  For how long?

15       A.   It is still not reinstated to today.

16       Q.   But you have a phone service today.  Correct?

17                   MS. PEERY:  Objection, form.

18       A.   Correct.

19       Q.   (BY MR. EKELAND)  And you have voice mail.

20   Correct?

21                   MS. PEERY:  Objection, form.

22       A.   Correct.

23       Q.   (BY MR. EKELAND)  And you never found out who

24   was trying to access your voice mail account.  Correct?

25                   MS. PEERY:  Objection, form.

Page 36

1    A.    I have not found out who did this, no.

2              MR. EKELAND:   Turn the page.

3              And if we could go to the first

4    paragraph.

5    A.    I have read the statement.

6    Q.    (BY MR. EKELAND)   Do you know who

7    MonkeyBar1970 is?

8    A.    I know that was the username that was

9    connected to these accounts that were created.

10   Q.    But you don't know who the person was behind

11   this.

12             MS. PEERY:   Objection, form.

13   A.    I do not know the person that was behind the

14   accounts.

15   Q.    (BY MR. EKELAND)   And it also says in the

16   paragraph:   Created profiles on two social media Web

17   sites that is dedicated to people with sexually

18   transmitted diseases.

19             Have you ever had a sexually transmitted

20   disease?

21   A.    I have not.

22   Q.    You self-prescribed Valtrex to yourself before

23   though.   Correct?

24   A.    That is correct.

25             MR. EKELAND:   You can go to page 11.

1            If we could go to the paragraph on the

2  bottom of the page.

3       A.   I have read the statement.

4       Q.   (BY MR. EKELAND)  And you can see the first

5  sentence that says:  DFC engineers acquired and

6  archived the client's LinkedIn and Facebook accounts.

7            Correct?

8       A.   That is what the statement says.

9       Q.   And do you have any reason to believe that

10  that statement isn't true?

11            MS. PEERY:  Objection, form.

12       A.   No.

13            No.

14            MR. EKELAND:  We can go to page 16,

15  please.

16       Q.   (BY MR. EKELAND)  Directing your attention to

17  the sentence at the top of the page.

18       A.   I have read the statement.

19       Q.   And is it your understanding that DFC's

20  forensic examiners created some links for you?

21            MS. PEERY:  Objection, form.

22       A.   It is my understanding that DFC, per their

23  report, created some links.

24       Q.   (BY MR. EKELAND)  Is it your testimony that

25  they merely created the links for this report?

1        MS. PEERY:  Objection, form.

2    A.    That is not my statement.

3    Q.    (BY MR. EKELAND)  What is your statement?

4        MS. PEERY:  Form.

5    A.    According to this report, links were created.

6    Q.    (BY MR. EKELAND)  Directing your attention to

7    the second bullet point on the page.

8        MR. EKELAND:  If you would highlight

9    that, please.

10   A.    I have read the statement.

11   Q.    (BY MR. EKELAND)  So you see how it says:

12   Each individual tracking URL captures IP address,

13   operating system, browser, screen resolution and hash

14   information for the device from which the tracking URL

15   is clicked.

16        Do you have any reason to believe that

17   that's not a true statement?

18        MS. PEERY:  Objection, form.

19   A.    I do not have any reason to believe that that

20   is not a true statement.

21   Q.    (BY MR. EKELAND)  As a matter of fact, it's

22   one of the things you were paying DFC $3,000 to do for

23   you.  Correct?

24        MS. PEERY:  Objection, form.

25   A.    This was part of what they did in creating the

1   report.

2       Q.   (BY MR. EKELAND)  So bringing your attention

3   to the second bullet point up from the bottom with the

4   lead word in bold "First."

5            MR. EKELAND:  And if we could get it all

6   the way down to where it says CX_Sandra Guerra.

7       A.   I have read the statement.

8       Q.   (BY MR. EKELAND)  Did you see on the bottom

9   where it says CX_Sandra_Guerra, and there's an

10  https://goo.gl/G5GE9Z?

11           Do you see that?

12           MS. PEERY:  Objection, form.

13      A.   Yes.  You repeated it a little bit

14  incorrectly, but yes, I see what you're referring to.

15  You put an extra G in.  But yes, I understand what

16  you're referring to.

17      Q.   (BY MR. EKELAND)  I defer to you and the text

18  on that.

19           Is it your testimony that that's -- you

20  never sent that link to Sandra Guerra -- Melody Joy

21  Cantu?  Excuse me.

22      A.   It is my testimony I did not send that link to

23  Melody Joy Cantu.

24      Q.   (BY MR. EKELAND)  Directing your attention to

25  the last bullet point.

1    A.   I have read the statement.

2    Q.   Can you see how in the last sentence it says:

3  You need to send the URL to each suspect on whatever

4  platform, e-mail, social media, text message works best

5  for that subject.

6              Correct?

7    A.   I see that.  I see the text that is before me,

8  yes.

9    Q.   And it's your testimony that you never did any

10  of that?

11              MS. PEERY:  Objection, form.

12    A.   That is correct.

13              MR. EKELAND:  Directing -- if I could get

14  page 19 up.

15              And if we could highlight the client

16  directed tracking URLs section with the two links

17  underneath it.

18    A.   I have read the statement in front of me.

19    Q.   (BY MR. EKELAND)  And so you see the phrase

20  "Client-directed tracking URLs."  Correct?

21    A.   I do see that.

22    Q.   What's your understanding of that phrase?

23              MS. PEERY:  Objection, form.

24    Q.   (BY MR. EKELAND)  You can answer.

25    A.   I didn't write that statement.  I can't

1   interpret it.

2       Q.   You see how underneath it, it says:

3   Melody_Cantu, and next to it it says https: and it's

4   followed by some other stuff.

5               Do you see that?

6       A.   I do.

7       Q.   And it's your testimony here today that you

8   never sent that link to either of the Cantus in any

9   way, shape or form.

10      A.   That is correct.

11      Q.   And do you see where it says Rodrigo_Cantu and

12  there's https: and the rest (indiscernible).  It's your

13  testimony here today that you never sent that link out

14  to either of the Cantus.  Correct?

15      A.   That is correct.

16              MR. EKELAND:  If we could now highlight

17  all the DFC directed tracking URL section.

18      A.   I see the statement.

19      Q.   (BY MR. EKELAND)  And so you see the phrase

20  DFC directed tracking URLs.

21              Correct?

22      A.   I do.

23      Q.   What's your understanding of that phrase?

24              MS. PEERY:  Objection, form.

25      Q.   (BY MR. EKELAND)  You can answer.

1    A.   I didn't write it so I'm not going to

2    speculate what it means.

3    Q.   And so you see underneath it where it says

4    Melody_Joy_from_Teresa and everything that follows in

5    that line?

6    A.   Yes, I do see it.

7    Q.   And it's your testimony here today that that

8    link that starts with the https you never sent to

9    either of the Cantus in any way, shape or form.

10                   MS. PEERY:  Objection.

11    A.   That is accurate.

12    Q.   (BY MR. EKELAND)  And directing your attention

13    to the next line, it's Dr.Cantu_from_Melissa, followed

14    by a hypertense link -- hypertense link https.

15                   It's your testimony here today that you

16    never sent that link to plaintiffs in any way, shape or

17    form.

18                   MS. PEERY:  Objection, form.

19    A.   That is correct.

20    Q.   (BY MR. EKELAND)  And directing your attention

21    to the Melody_Joy_via_Phone and the link that follows

22    that, is it your testimony here today that you never

23    sent that in any way, shape or form to the plaintiff?

24                   MS. PEERY:  Objection, form.

25    A.   That is correct.

1              MR. EKELAND:  If we could go to the first

2    bullet point in the box in the bottom of this page

3    right under important.

4        Q.   (BY MR. EKELAND)  Can you let me know when

5    you're done reading.

6        A.   I have read the statement.

7        Q.   And so you've never ever notified DFC that you

8    sent out tracking URLs to the Cantus.  Correct?

9        A.   That is correct.

10             MR. EKELAND:  If you could go to page 21,

11   please.

12       Q.   (BY MR. EKELAND)  And if we could look at

13   the -- you can see the whole thing.

14             Do you see the tracking link up at the

15   top where it says Melody_Joy_via_Phone?

16       A.   I do see that.

17       Q.   And that's one of the DFC directed links we

18   just looked at.  Correct?

19             MS. PEERY:  Objection, form.

20       A.   I assume that it is.  I do not --

21       Q.   (BY MR. EKELAND)  We can match them so I'm not

22   worried about it.

23             And underneath you see --

24             MS. PEERY:  Form.

25       Q.   (BY MR. EKELAND) -- a table that says first

Page 44

1  click, and then you see another header that says second

2  click.

3                    Do you see that information?

4      A.   I do.

5      Q.   That's information extracted from plaintiffs'

6  computers and smartphones.  Correct?

7                    MS. PEERY:  Objection, form.

8      A.   I -- I do not know.  This was created by DFC,

9  but I could assume the same thing that you are.

10     Q.   (BY MR. EKELAND)  It's what you paid them to

11 do.

12                   MS. PEERY:  Objection, form.

13     Q.   (BY MR. EKELAND)  You can answer.

14     A.   I'm sorry, Mr. Ekeland, was there a question?

15     Q.   Yes.

16                   The information that you're looking at in

17 this table, it's what you paid DFC to get for you.

18                   MS. PEERY:  Objection, form.

19     A.   I'm not sure I completely agree with that

20 statement.  I did pay them to find who has been hacking

21 my -- or making hacking attempts on my systems.

22     Q.   But you did pay them to write this Phase I

23 report.  Correct?

24                   MS. PEERY:  Objection, form.

25     A.   I did.  I did.

1          MR. EKELAND:  Could you go to page 23.

2          VIDEOGRAPHER:  I'm sorry.  You cut out.

3    Page what?

4          MR. EKELAND:  Oh, I'm sorry, page 23.

5          And if we could highlight the first

6    bullet point.

7    A.    I have read the statement.

8    Q.    (BY MR. EKELAND)  And do you see the last

9    clause there, it says:  We conclude that a Phase II

10   forensics examination is recommended.

11         Correct?

12   A.    That is what it states.

13   Q.    And you agreed with that conclusion.  Correct?

14         MS. PEERY:  Objection, form.

15   A.    I don't know if I agree with that.

16   Q.    (BY MR. EKELAND)  Well, you did testify

17   earlier that you took a copy of this Phase I report

18   down to the San Antonio Police Department.  Correct?

19         MS. PEERY:  Objection, form.

20   A.    That is a correct statement.

21   Q.    (BY MR. EKELAND)  And you did tell the

22   San Antonio Police Department that in order to get a

23   Phase II report, you needed to file a police report.

24   Correct?

25         MS. PEERY:  Objection, form.

1    A.   Yes.  I told them that I needed to file a

2  police report if I was going to have Digital Forensics

3  Corporation continue their investigation.

4    Q.   (BY MR. EKELAND)  And you'd read the sample

5  police report that we reviewed earlier now before you

6  told the police that.  Correct?

7          MS. PEERY:  Objection, form.

8    A.   I had read the Digital Forensics Phase I

9  report in its entirety before I went to file a police

10 report.

11   Q.   (BY MR. EKELAND)  And that was a "yes."

12         MS. PEERY:  Objection, form.

13         MR. EKELAND:  Directing your attention to

14 page 24.

15         VIDEOGRAPHER:  I'm sorry.  You cut out

16 again.  Page what?

17         MR. EKELAND:  Oh, I'm sorry.  Page 24.

18         VIDEOGRAPHER:  Thank you.

19         MR. EKELAND:  And if we could highlight

20 the first bullet point.

21   A.   I have read the statement.

22   Q.   (BY MR. EKELAND)  And so you see where it

23 says:  File a police report with the appropriate police

24 department.

25         And you did do that like you said at the

Page 47

1   San Antonio Police Department.  Correct?

2       A.   I did file a police report with the

3   San Antonio Police Department.

4       Q.   And when you filed that police report with the

5   San Antonio Police Department, did you attach a copy of

6   the Phase I report?

7               MS. PEERY:  Objection, form.

8       A.   I did.

9       Q.   (BY MR. EKELAND)  Did you supplement the

10  police report with anything else?

11              MS. PEERY:  Objection, form.

12      A.   If the -- I'm not sure if I got asked for a

13  supplement, there was additional information that was

14  provided to the San Antonio Police Department.

15      Q.   (BY MR. EKELAND)  And what additional

16  information was that?

17      A.   The information that I was aware of including

18  previous police reports, letters sent from my attorney

19  asking her to not contact me, information about

20  contacting my place of work.  That was information that

21  I also shared with the San Antonio Police Department.

22      Q.   And you produced that to us.  Correct?

23              MS. PEERY:  Objection, form.

24      A.   I do not have a copy of what I gave them.

25      Q.   (BY MR. EKELAND)  You've searched for a copy?

1              MS. PEERY:  Objection, form.

2      A.   I was never given a copy.

3      Q.   (BY MR. EKELAND)  Have you searched for the

4 information that you gave to the San Antonio Police

5 Department?

6              MS. PEERY:  Objection, form.

7      A.   I have -- the information I have access to, I

8 have searched and it has been provided.

9      Q.   And drawing your attention to the next bullet

10 point.

11     A.   I see the statement.

12     Q.   So you see it says:  Provided time stamped

13 copy of the police report containing this Phase I

14 Evaluation Report to DFC.

15              Did you do that?

16     A.   I did not.

17     Q.   Drawing your attention to the next bullet

18 point directly underneath the one we're looking at.

19     A.   I see the statement.

20     Q.   And as you previously testified, you did not

21 send out a DFC tracking URLs to plaintiffs.  Correct?

22     A.   That is correct.

23     Q.   And directing your attention to the last

24 bullet point.

25     A.   I do see that.

1    Q.   Did you alert DFC of any ongoing cyber

2    harassment?

3              MS. PEERY:  Objection, form.

4    A.   I did not.

5              MR. EKELAND:  We're done with this

6    exhibit.

7    A.   Can we take a break?

8    Q.   I was thinking the same thing.

9              MR. EKELAND:  Brandy, are you okay with

10   taking a break now?

11             MS. PEERY:  Okay.  Short break, 10

12   minutes.

13             MR. EKELAND:  Yeah.  Let's do 10 minutes.

14             MS. PEERY:  Sounds good.

15             VIDEOGRAPHER:  Going off the video

16   record.

17             (A recess was taken.)

18             VIDEOGRAPHER:  We're back on the video

19   record.  This is the media file number 2.  The time is

20   11:39 a.m.

21   Q.   (BY MR. EKELAND)  Dr. Guerra, are you ready to

22   go again?

23   A.   I am.

24   Q.   Standard question.

25             Did you ingest any drugs or alcohol or is

1   there -- did anything happen over the break that would

2   prevent you from testifying truthfully now?

3       A.   No.

4                (Exhibit F was marked.)

5                MR. EKELAND:  If we could get Exhibit F

6   up, please.

7       Q.   (BY MR. EKELAND)  And if you could just take a

8   look at that and let me know when you're done.

9       A.   I see it.

10      Q.   Now, this is a -- a table that you produced to

11  us.  Correct?

12      A.   That is correct.

13      Q.   And I think yesterday you produced another 42

14  pages of this table of texts.

15               How did you compile this table?

16      A.   I downloaded a program on to my computer that

17  would take text messages from my phone with a phone

18  number and be able to compile a summary of all text

19  messages between myself and another phone number.

20      Q.   And what software was that?

21      A.   I believe the software is called

22  Export-Message.

23      Q.   And did you pay for that software?

24      A.   I do not recall.

25      Q.   And what phone numbers did you use the

1   software on?

2        A.   On Dr. David Cantu's, my ex-husband.

3        Q.   And no other phone number?

4        A.   Correct.

5        Q.   And you still have the file saved on your

6   computer that this software produced?

7        A.   I do.

8        Q.   And the tables that you just produced to us

9   last night, is that the complete set of your text

10  extractions?

11       A.   It is.

12       Q.   Have you downloaded any other kinds of

13  software or used any kind of software yourself to

14  search or compile for information related to this case?

15       A.   I'm sorry.  I need a clarification on that

16  question.

17       Q.   Sure.

18            Just like you downloaded this software to

19  compile these tests, have you downloaded or used any

20  other kind of software to compile or search for

21  information related to this case?

22       A.   Not that I can recall.

23       Q.   How about to investigate -- withdrawn.

24            And what phone was this that -- was

25  this -- what -- this was for the software you used to

1    compile this, you were using it to analyze the messages

2    sent to your phone from David Cantu.  Is that correct?

3         A.   I would not use the word "analyze."

4         Q.   What word would you use?

5         A.   Compile.

6         Q.   And so you solely compiled information related

7    to Dr. Cantu's phone number.

8              MS. PEERY:  Objection, form.

9         Q.   (BY MR. EKELAND)  You can --

10        A.   I'm sorry.  You cut out.

11        Q.   I'm sorry.

12             So the software that you used to compile

13   these texts, you only used it to compile texts from

14   Dr. Cantu's phone number.  Is that correct?

15             MS. PEERY:  Objection, form.

16        A.   That is correct.

17        Q.   (BY MR. EKELAND)  Did you use that software

18   for anything else?

19             MS. PEERY:  Objection, form.

20        A.   No.

21             (Exhibit J was marked.)

22             MR. EKELAND:  If we could get Exhibit J

23   up.

24        Q.   (BY MR. EKELAND)  Just take a look at that and

25   let me know when you're done.

1      A.    Okay.

2      Q.    Do you recognize this document?

3      A.    I do.

4      Q.    What is it?

5      A.    It is a Motion for the Enforcement of

6    Possession or Access and Order to Appear.

7      Q.    And Dr. Cantu filed that motion against you.

8    Correct?

9      A.    I believe so.

10     Q.    And you have no reason to doubt the file stamp

11   that's sideways on the side if it that says it was

12   filed by the district clerk of Bexar County on

13   May 22nd, 2018.  Correct?

14     A.    Correct.  It's pronounced "bear."

15           But yes, you're correct.

16     Q.    Bexar County.  Thank you.

17           MR. EKELAND:  You can take Exhibit J

18   down.

19           Now let's go to Exhibit N.

20           (Exhibit N was marked.)

21     Q.    (BY MR. EKELAND)  And just let me know when

22   you're done looking at the front page.

23     A.    I have seen it.

24     Q.    And do you recognize this document?

25     A.    I do.

Page 54

1    Q.   What is it?

2    A.   It is a report from Detective.com.

3    Q.   And is this what you were referencing earlier

4    in your testimony when you were talking about hiring a

5    private investigator.  Correct?

6              MS. PEERY:  Objection, form.

7    A.   That is correct.

8    Q.   (BY MR. EKELAND)  And you paid Detective.com

9    for its services.  Correct?

10   A.   I believe so.

11   Q.   Do you remember how much you paid?

12   A.   Not off the top of my head, no.

13   Q.   Did you sign up for those services via Web

14   site?

15   A.   I cannot recall.

16   Q.   But you communicated with Detectives.com

17   through the e-mail.  Correct?

18   A.   The report came by e-mail.  I communicated by

19   phone with somebody.

20   Q.   Do you know the name of the person that you

21   communicated with?

22   A.   I do not recall.

23   Q.   Have you searched for your e-mails with

24   Detectives.com?

25             MS. PEERY:  Objection, form.

1      A.    Yes.

2      Q.    (BY MR. EKELAND)  And did you find them?

3      A.    The report that you see in front of you is

4   what I received by e-mail.

5      Q.    It was attached to an e-mail?

6      A.    Most likely.

7      Q.    Have you produced that e-mail?

8      A.    I do not know.

9      Q.    When you searched for e-mails with

10  Detective.com, how many e-mails did you find?

11     A.    I do not recall.

12           MS. PEERY:  Form.

13     Q.    (BY MR. EKELAND)  But you produced to us the

14  ones that you found.  Correct?

15     A.    It could be produced.

16     Q.    And you could go back and look in your phone

17  records to see whether you made phone calls to

18  Detectives.com.  Correct?

19           MS. PEERY:  Objection, form.

20     A.    I would imagine I could.

21     Q.    (BY MR. EKELAND)  So directing your attention

22  to the paragraph that starts with the bold word

23  Summary, just take a look at that.

24     A.    I have read the statement.

25     Q.    Is that an accurate statement of what you

Page 56

1    asked them to do for you?

2             MS. PEERY:  Objection, form.

3      A.   I cannot recall.

4      Q.   (BY MR. EKELAND)  Do you have any reason to

5    doubt that's an accurate statement of what you asked

6    them to do for you?

7             MS. PEERY:  Objection, form.

8      A.   No.

9             MR. EKELAND:  If we go to page 3, please.

10             And if we could go to the second full

11   paragraph up from the bottom starting with:  Most

12   everyone who investigators talked.

13      A.   I've read it.

14      Q.   (BY MR. EKELAND)  Do you have any reason to

15   believe that Detectives.com isn't telling you the truth

16   about what they found when they investigated?

17             MS. PEERY:  Objection, form.

18      A.   Can you restate the question.

19      Q.   (BY MR. EKELAND)  Do you have any reason to

20   believe that that statement that you just read isn't

21   accurate?

22             MS. PEERY:  Objection, form.

23      A.   No.

24             MR. EKELAND:  If we could go to the last

25   page, please, it's page 19.

1    Q.   (BY MR. EKELAND)   And if we could -- directing

2    your attention to the first full paragraph on that

3    page.

4    A.   I have read it.

5    Q.   So you see that it says:   In conclusion agents

6    spoke with a multitude of various sources who indicated

7    that they had never heard of any type of harassment

8    charges, allegations of harassment, arrests for any

9    type of domestic disturbances, assault or battery

10   within the family unit and indicated that the subject

11   appears to have always been a good housewife and a

12   mother and a wonderful neighbor.

13              Do you have any reason to doubt that

14   Detectives.com truly believed that?

15              MS. PEERY:   Objection, form.

16   A.   I do not think I am someone who can speak to

17   what Detectives.com believed.

18   Q.   (BY MR. EKELAND)   Do you have any reason to

19   believe that that's not an accurate statement?

20              MS. PEERY:   Objection, form.

21   A.   I have no -- no.   I do not have any reason to

22   believe anything different.

23   Q.   (BY MR. EKELAND)   After you received this

24   report, did you ask Detectives.com to do any more work

25   for you?

1    A.   I did not.

2              MR. EKELAND:  I'm done with Exhibit N.

3    Q.   (BY MR. EKELAND)  And you recall filing a

4    complaint with Child Protective Services against Melody

5    Joy Cantu.  Correct?

6              MS. PEERY:  Objection, form.

7    A.   I -- I did file a complaint with Child

8    Protective Services.

9              MR. EKELAND:  If I could get Exhibit I

10   and the lower case A up.

11             (Exhibit I-A was marked.)

12   Q.   (BY MR. EKELAND)  Just take a look at that and

13   let me know when you're done.

14   A.   The print is very small.  If you want me to

15   read it, it would need to be enlarged, but I have seen

16   the page that you're showing.

17   Q.   And we can below up anything that you want us

18   to so why don't we start --

19             Well, first of all have you -- do you

20   recognize this document?

21   A.   It -- yes, I recognize the document.

22   Q.   You've seen it before.

23   A.   Yes.

24   Q.   When did you first see it?

25   A.   I cannot recall.  It was during family custody

1   situation.

2      Q.   But this was the CPS Investigation Report

3   generated as a result of your complaint.  Correct?

4              MS. PEERY:  Objection, form.

5      A.   That is what it appears to be, yes.

6      Q.   (BY MR. EKELAND)  And that's your name right

7   up on the upper right-hand side where it says:  Case

8   name:  Guerra, Sandra.

9            Right?

10     A.   I did not write that.

11     Q.   But you did make the complaint to CPS.

12   Correct?

13            MS. PEERY:  Objection, form.

14     A.   Yes.

15     Q.   (BY MR. EKELAND)  And this investigation

16   report is a direct result of your complaint with CPS.

17   Correct?

18            MS. PEERY:  Objection, form.

19     A.   That is, I think, a safe assumption, but I

20   don't know that for a fact.

21     Q.   (BY MR. EKELAND)  And you see on the left-hand

22   side at the top where it says "Intake Received."

23            And then there's the date May 29th, 2018?

24     A.   I do see that.

25     Q.   And that's the date that you made the

1   complaint to CPS.  Correct?

2       A.   Correct.

3       Q.   And you see a few lines underneath that where

4   it says:  Overall disposition:  Ruled out.

5               Correct?

6       A.   That is what it says, yes.

7       Q.   And the reason that CPS closed this

8   investigation or ruled it out is because they found

9   that there was no foundation for your claims.  Correct?

10              MS. PEERY:  Objection, form.

11      A.   I cannot tell you the process of CPS and how

12  they make determinations.

13              MR. EKELAND:  If we could go to what's in

14  the tiny, tiny, tiny Bates numbers on the right-hand

15  side to Bates number page 15.

16              Well done.

17              If we can highlight that paragraph in the

18  middle that has the redaction in it that starts with

19  6.6.18 dispositional staffing.

20      A.   I have read that.

21      Q.   (BY MR. EKELAND)  And so you've seen that it

22  says:  This case is being close -- it's a typo -- it

23  should say closed -- ruled out and abbreviated.  This

24  case is clearly not a CPS issue and more of a custody

25  issue.

1          Then there's a redacted line.

2          (Reading)  The children were observed to

3   be free from marks and bruising and there was no outcry

4   made.  There is no reason for CPS to be involved with

5   this family.  The children reside with Ms. Guerra and

6   they are refusing to go with their father because he is

7   back in a relationship with Joy.  Mr. Cantu and Joy do

8   not reside in the same residence and Joy has not had

9   contact with the girls since 2015.

10          After this report was issued, did you ask

11  CPS to reopen their investigation?

12          MS. PEERY:  Object to form.

13  A.    No.

14          MR. EKELAND:  I'm done with this exhibit.

15          If I could just get Exhibit K, lower case

16  a [sic] up, please.

17          (Exhibit K-A was marked.)

18  Q.    (BY MR. EKELAND)  Just take a look at that and

19  let me know when you see it -- or when you're done with

20  it.  Sorry.

21  A.    Okay.  I have seen it.

22  Q.    And so you could see it's an e-mail from

23  Barry Efron to Tina Torres.  Right?

24  A.    That is what it appears to be.

25  Q.    And Barry Efron was a lawyer for the Cantus in

1   the civil custody matter we just discussed.  Correct?

2       A.   He was a lawyer for Dr. David Cantu.

3       Q.   And Tina Torres was your lawyer at the time.

4   Correct?

5       A.   Yes.

6       Q.   And this e-mail is saying that you've been

7   noticed for deposition in the civil case on

8   October 4th.  Correct?

9            MS. PEERY:  Objection, form.

10      A.   It's an e-mail between two people, but yes,

11  that's what it appears to say.

12      Q.   (BY MR. EKELAND)  But you communicated with

13  your lawyer during the civil case.  Correct?

14           MS. PEERY:  Objection, form.

15           Do not answer any questions regarding

16  your communications, privileged communications with

17  your attorney.

18      Q.   (BY MR. EKELAND)  The fact that you had the

19  communication is not privileged.  The subject matter of

20  the communication is privileged.

21           MS. PEERY:  You're asking her --

22           MR. EKELAND:  I'm asking her if she

23  communicated with her lawyer during the civil case.  I

24  am not asking the subject matter of the communication.

25           MS. PEERY:  Objection, form.

1    Q.   (BY MR. EKELAND)   Fine.   You can answer.

2         Did you communicate with your lawyer

3    Tina Torres during the civil case?

4    A.   Yes.

5    Q.   And as a matter of fact, you did testify at

6    this deposition in the civil case on October 4th.   Is

7    that correct?

8    A.   I did.

9    Q.   And after you testified in that deposition,

10   you had an opportunity to review the deposition

11   transcript and correct any errors.   Correct?

12   A.   I believe so.

13        MS. PEERY:   Objection, form.

14        MR. EKELAND:   I'm done with this exhibit.

15        If I could get exhibit M, please.

16        (Exhibit M was marked.)

17   Q.   (BY MR. EKELAND)   (Indiscernible).

18   A.   I'm sorry.   I did not hear you.

19   Q.   I'm getting a -- did you get the feedback

20   loop?   I got a feedback loop there for a second.

21        Can you hear me now?

22        Okay.   I don't hear it now.

23        If you can just take a look at that and

24   let me know when you're done.

25   A.   I see it.

1        Q.    Do you recognize it?

2        A.    No.

3        Q.    Okay.  Do you see up at the top on the upper

4    left-hand side where it says Police Report all the way

5    on the top on the left?

6        A.    I do.

7        Q.    Do you see how it says San Antonio Police

8    Department?

9        A.    I do.

10        Q.    And do you see how it says Primary Offense:

11    Harassment?

12        A.    Yes.

13        Q.    It's in the upper right-hand.

14              And then underneath that there's a box

15    that says date and time occurred.  And it says from

16    April 4th, 2018, to September 4th, 2018?

17        A.    I see those dates, yes.

18        Q.    And that's the date range that you told the

19    San Antonio Police Department that you were -- the

20    harassment -- alleged harassment occurred in.  Correct?

21              MS. PEERY:  Objection, form.

22        A.    I do not recall.

23              MR. EKELAND:  If we could go to page 2

24    of 3.

25              And if we could go to the bottom of the

1   page and highlight the two boxes, the one that have

2   Cantu in them and then --

3                   There you go.

4       Q.   (BY MR. EKELAND)  If you could take a look at

5   that for me, please.

6       A.   I read it.

7       Q.   So you see the sentence that starts about

8   halfway in the second up from the bottom halfway in

9   where the sentence starts V1, which is you.  Right?  V1

10  is you.  Correct?

11      A.   (No audible answer.)

12      Q.   It says:  V1 stated she hired a forensic

13  computer service to find out who the IP address belongs

14  to that has done all this.  V1 stated that they

15  verified it was SP1.

16                  Is that correct?

17                  MS. PEERY:  Objection, form.

18      A.   That is what it states.  You read it

19  correctly.

20      Q.   (BY MR. EKELAND)  Did you tell the San Antonio

21  Police Department that Digital Forensics Corporation

22  had verified the fact that your harasser was Melody Joy

23  Cantu?

24      A.   I do not recall.

25      Q.   Then going to the next sentence there -- and

1   we'll have to go on to the next page -- it says:  V1

2   stated they then suggested V1 --

3                MR. EKELAND:  And if you could go to the

4   next page.

5        Q.   (BY MR. EKELAND)  It says:  V1 stated they

6   then suggested V1 file a police report.

7                And that suggestion came from the Phase I

8   report.  Correct?

9        A.   It did, yes.

10        Q.   And then they say they furnished you with a

11   SAPD form CIC-01 for follow-up.

12                Is that accurate?

13                MS. PEERY:  Objection, form.

14        A.   I do -- I do not recall.

15        Q.   (BY MR. EKELAND)  Have you searched your

16   records for everything related to your police report?

17        A.   Yes.  Yes.

18                MS. PEERY:  Objection, form.

19        Q.   (BY MR. EKELAND)  So you don't recall whether

20   or not you filled out the SAPD form CIC-01?

21                MS. PEERY:  Objection, form.

22        A.   I do not believe I filled out a form after my

23   police report was completed.

24        Q.   (BY MR. EKELAND)  But you did follow up with

25   the police.  Correct?

1          MS. PEERY:  Objection, form.

2      A.   I do not recall following up with the police.

3      Q.   (BY MR. EKELAND)  Did you talk to the district

4  attorney's office about this case?

5      A.   I do not recall if I spoke with the district

6  attorney's office about the case.

7      Q.   Have you searched your records, your e-mails

8  and everything for all your communications with the

9  district attorney related to this harassment complaint?

10          MS. PEERY:  Objection, form.

11     A.   Yes.

12     Q.   (BY MR. EKELAND)  And did you find

13  communications?

14          MS. PEERY:  Objection, form.

15     A.   No.

16     Q.   (BY MR. EKELAND)  Is it your testimony here

17  today that you never communicated with the district

18  attorney's office in relation to this harassment

19  complaint that you filed?

20          MS. PEERY:  Objection, form.

21     A.   That is not my testimony.

22     Q.   (BY MR. EKELAND)  So you did communicate with

23  the district attorney's office?

24          MS. PEERY:  Objection, form.

25     A.   I had voice conversations with someone from

1   the district attorney's office not related to this

2   filing of a police report.

3       Q.   (BY MR. EKELAND)  What was it in relation to?

4       A.   I was contacted by the district attorney's

5   office sometime after it was made aware to me that

6   Ms. Cantu had been arrested.

7       Q.   And you cooperated with the district

8   attorney's office in her prosecution.  Correct?

9            MS. PEERY:  Objection, form.

10      A.   I provided any information that they

11  requested, which I don't believe they requested

12  anything.  So I would say yes, I cooperated.

13      Q.   (BY MR. EKELAND)  Who did you talk to at the

14  district attorney's office?

15      A.   I don't recall.

16      Q.   Do you recall how you communicated?

17      A.   By phone.

18      Q.   So you can search for phone records and bills

19  and find out whether you talked to them?

20           MS. PEERY:  Objection, form.

21      Q.   (BY MR. EKELAND)  You can answer.

22      A.   I didn't hear a question.  I'm sorry.  Please

23  restate.

24      Q.   Oh.  I said so you could search for phone

25  records and find out when you talked to the district

1    attorney's office.  Correct?

2              MS. PEERY:  Objection, form.

3        A.    Yes.

4        Q.    (BY MR. EKELAND)  Did the district attorney's

5    office ask you to fill out any affidavits?

6        A.    Not that I recall.

7        Q.    Did you provide any information to them at all

8    in any form, whether written, recorded or otherwise?

9              MS. PEERY:  Objection, form.

10       A.    Not that I recall.

11             MR. EKELAND:  Okay.  I'm done with

12   Exhibit M.

13       Q.    (BY MR. EKELAND)  And you're aware that your

14   initial report or complaint to the San Antonio Police

15   Department is on video.  Correct?

16             MS. PEERY:  Objection, form.

17       A.    You have provided a copy of that recording.

18   Other than that I didn't have any reason to know that.

19       Q.    (BY MR. EKELAND)  Have you viewed the video

20   before?

21             MS. PEERY:  Objection, form.

22       A.    Yes.

23       Q.    (BY MR. EKELAND)  And that is you in the

24   video?

25             MS. PEERY:  Objection, form.

1     A.   If we -- I want to make sure we're very

2  specific which video you're talking about.  It was me

3  making a police report at the San Antonio Police

4  Department Prue-Substation.

5     Q.   (BY MR. EKELAND)  Right.  And it's on body cam

6  footage from an officer.  I could play it, but I don't

7  think I need to.

8               MS. PEERY:  Objection, form.

9     Q.   (BY MR. EKELAND)  Recently you were involved

10  in a lawsuit with one of your employers Humana.

11  Correct?

12     A.   There was a lawsuit, yes, that has been

13  resolved.

14               MR. EKELAND:  Could I get Exhibit R,

15  please.

16               (Exhibit R was marked.)

17     Q.   (BY MR. EKELAND)  Take a look at that and let

18  me know when you're done.  And we can scroll through

19  the pages if you want.

20     A.   I've seen it.

21     Q.   And this is a news article about the lawsuit

22  with Humana.  Correct?

23               MS. PEERY:  Objection, form.

24     A.   I believe it is a news article, yes.

25     Q.   (BY MR. EKELAND)  And directing your attention

1    to the bottom paragraph in the news article.

2        A.    Yes, I've seen that.

3        Q.    And you were accused -- you were accused by a

4    subordinate of harassment.  Correct?

5              MS. PEERY:  I'm going to object and

6    instruct the witness not to answer.  There is a

7    settlement agreement that has a confidentiality and

8    disclosure provisions that prohibits Dr. Guerra from

9    commenting on the lawsuit other than to say that there

10   was a lawsuit and the lawsuit was resolved.  Absent a

11   court order, she cannot respond to these questions.

12             So I'm going to instruct her to -- not to

13   respond.  I understand you need to get your questions

14   on the record, assuming if you want to go before the

15   judge on this issue so I'm fine with that.  So in lieu

16   of me repeating this same instruction when you ask your

17   question, I'll just say "Same instruction" and if we

18   can have an agreement we understand that that's what

19   this is referring to, then it might make this go

20   easier.

21             MR. EKELAND:  Yeah, that's fine.  Or do

22   you want to do a blanket objection to all of it and

23   then we'll go to the court and see if we can get an

24   order to get the testimony?

25             MS. PEERY:  That's fine.  But there may

1  still be some specific questions that I want to make

2  sure we're specifically giving her the instruction not

3  to answer just so we're not just covered with the

4  court, but we're covered with Humana as well.

5            MR. EKELAND:  Yeah.  And just --

6            Okay.  It's fine.  Why don't we just go

7  through this and then we'll just say you're objecting

8  on the grounds that you just objected on and use

9  whatever phrase you want to use to do that.  That's

10 fine.  I'm okay with that.

11    Q.   (BY MR. EKELAND)  So going back to the

12 paragraph you just reviewed, that's an accurate

13 statement, isn't it?

14            MS. PEERY:  Objection -- same objection.

15            Instructing the witness not to respond.

16    Q.   (BY MR. EKELAND)  And you went into mediation

17 over these claims.  Correct?

18            MS. PEERY:  Same objection.

19            Same instruction.

20    Q.   (BY MR. EKELAND)  And you ultimately settled

21 these claims.  Correct?

22            MS. PEERY:  Same instruction --

23            Well, you may answer that one.

24    A.   Mr. Ekeland, can you repeat the question.

25    Q.   (BY MR. EKELAND)  Oh, yeah.  I'm sorry.

1          You eventually settled this lawsuit with

2   Humana.  Correct?

3       A.   The lawsuit has been settled, yes.

4       Q.   Okay.

5            MR. EKELAND:  If we could go -- is there

6   anything left in this article because my page printed

7   out blank so I just need to see the rest of it.

8            Okay.  If we could go to the third

9   paragraph.

10      Q.   (BY MR. EKELAND)  Just let me know when you

11  are done reading.

12      A.   I am done reading it.

13      Q.   And that's an accurate statement that you sent

14  sexually suggestive texts to a subordinate.  Correct?

15           MS. PEERY:  Same objection.

16           Same instruction.

17           MR. EKELAND:  I'm not asking her about

18  the settlement.  I'm asking if that's a true statement

19  and that has nothing to do with the settlement.

20           MS. PEERY:  As I stated previously on the

21  record, the terms and conditions of the settlement

22  agreement, including confidentiality, prohibit

23  Dr. Guerra from making any statements absent a court

24  order other than there was a lawsuit and the lawsuit

25  has been resolved.

1            So same -- same objection.

2            Same instruction.  Do not answer.

3            MR. EKELAND:  Okay.  If we could just

4  take the paragraph down, but I want to look at the rest

5  of this page.

6            If you could highlight the next

7  paragraph.

8       A.   I see the statement.

9       Q.   (BY MR. EKELAND)  And it's an accurate

10  statement.  Correct?

11            MS. PEERY:  Same objection.

12            Same instruction.

13            MR. EKELAND:  If we could take that

14  paragraph down and if we could go to the paragraph that

15  starts with the quotations from the Humana human

16  resources executive.

17            MS. PEERY:  And I object to

18  characterization of this statement but --

19       Q.   (BY MR. EKELAND)  I just highlighted the

20  paragraph that states:  Dr. Guerra admitted to her

21  behavior and comments.

22       A.   I have read it.

23       Q.   You were terminated by Humana?

24            MS. PEERY:  Same objection.

25            Same instruction.

1          MR. EKELAND:  How is the fact whether or

2   not she was terminated by Humana covered by this

3   settlement agreement?

4          MS. PEERY:  Well, I can't get into that

5   because that is the subject of the settlement

6   agreement.

7          So same objection.

8          Same instruction.  And you can take that

9   up with the court.

10          MR. EKELAND:  Counselor, that makes no

11   sense.  This is a public statement from Humana and

12   whether or not she was fired is outside the scope of

13   the settlement agreement.  We will take this up with

14   the court.

15          MS. PEERY:  That's fine.

16          MR. EKELAND:  And we are going to ask to

17   see the settlement agreement so --

18          MS. PEERY:  You can -- we will comply --

19          On the record -- on the record -- on the

20   record we will comply with any order of the court.

21          MR. EKELAND:  All right.  And you also --

22   well, we'll go there.

23   Q.   (BY MR. EKELAND)  So do you know Ricky D.

24   Edwards?

25          MS. PEERY:  You may answer.

1      A.   I know who Ricky Edwards is, yes.

2      Q.  (BY MR. EKELAND)  And he was the Humana human

3  resources executive?

4              MS. PEERY:  You may answer.

5      A.   I do not know his title.

6      Q.  (BY MR. EKELAND)  If we could go to the next

7  paragraph.

8      A.   I've read it.

9      Q.  Is that an accurate statement that you

10  originally sued Humana in state district court in San

11  Antonio seeking damages ranging from $25,000 to one

12  million plus unspecified punitive damages.

13             Is that a true statement?

14              MS. PEERY:  You may answer.

15      A.   That is correct.

16      Q.  (BY MR. EKELAND)  And then the lawsuit was

17  moved to federal court in San Antonio after that.

18  Correct?

19              MS. PEERY:  You may answer.

20      A.   Yes.

21              MR. EKELAND:  Okay.  You can take this

22  one down.

23      Q.  (BY MR. EKELAND)  Dr. Guerra, you're not

24  texting or you don't have any chat windows or anything

25  like that in front of you, do you?

1  A. I do not.

2    (Exhibit K was marked.)

3    MR. EKELAND:  If I could get Exhibit K,

4 please.

5    And I have lost my image here.

6    VIDEOGRAPHER:  Do we need to go off the

7 video.

8    MR. EKELAND:  Nah, I'm good.  I'm good.

9 I got it back, just too many monitors, too many windows

10 open.

11  Q. (BY MR. EKELAND)  If you could just take a

12 look at that and let me know when you're done looking

13 at it.

14  A. I do see it.

15  Q. And do you see this is a letter from our law

16 firm to Tina Torres.

17    And tina Torres was your lawyer at the

18 time.  Correct?

19    MS. PEERY:  Objection, form.

20  A. Yes.

21  Q. (BY MR. EKELAND)  And this is a evidence

22 preservation notice for this case.  Correct?

23    MS. PEERY:  Objection, form.

24  A. That is what it appears to be.

25  Q. (BY MR. EKELAND)  Have you seen it before?

Page 78

1    A.   Yes.

2    Q.   And you see the date up on the top of

3  September 25th, 2019.  Correct?

4    A.   I do.

5              MR. EKELAND:  I'd like to take a short

6  break -- 10-minute break just to see what other

7  questions I have.

8              MS. PEERY:  No problem.

9              MR. EKELAND:  This may be a short one

10  today.  I don't know.  Don't hold me to that, but I

11  have to check out stuff.  Let's call it -- what is

12  it -- I don't even know what time it is now.

13              MS. PEERY:  It's like 11:30.  So you want

14  to say 10 minute -- well, it's a little before 11:30.

15  Let's just say 11:40.

16              MR. EKELAND:  Yeah.  That sounds good.

17              VIDEOGRAPHER:  Going off the video

18  record.  We're off.

19              (A recess was taken.)

20              VIDEOGRAPHER:  We're back on the video

21  record at 12:42 p.m.

22    Q.   (BY MR. EKELAND)  Dr. Guerra, a standard

23  question.

24              Did you take any drugs, ingest any

25  alcohol or did anything happen on the break that would

1    render it impossible for you to testify truthfully?

2        A.    No.

3        Q.    Okay.  If we could get -- well, I've got to

4    mop up a question.

5                  One is do you recall what type of phones

6    you had during the time period you were communicating

7    with DFC?

8        A.    My recollection is I have had an iPhone for

9    the last 15 years so some type of iPhone.  I don't

10   remember which one.

11       Q.    Do you have an iCloud account?

12       A.    Yes.

13       Q.    Also, did you ever file a complaint or any

14   kind of report about DFC with the Better Business

15   Bureau?

16       A.    I did not.

17                  (Exhibit T was marked.)

18                  MR. EKELAND:  If we could go to

19   Exhibit T.

20       A.    I see the document.

21       Q.    (BY MR. EKELAND)  Have you seen this document

22   before?

23       A.    I don't recall.

24       Q.    Okay.  Could we go -- well, do you have any

25   reason to doubt that this is the -- your objections and

1    responses to Plaintiffs' First Request for Production

2    of Documents?

3                    MS. PEERY:  Objection, form.

4        A.    I have no reason to doubt it.

5                    MR. EKELAND:  If we could go to page 2,

6    please.

7        Q.    (BY MR. EKELAND)  And do you see the signature

8    block signed by Ricardo Cedillo.  And there's Brandy

9    Peery's name on there.

10                    Those are your lawyers in this matter.

11   Correct?

12       A.    That is correct.

13       Q.    And you see how underneath the heading the

14   certificate of service, it says that:  I certify that

15   on this day, 28th day of February 2022, a true and

16   correct copy of the foregoing was served on counsel of

17   record.

18                    And you see Mr. Cedillo's signature

19   there.  Correct?

20       A.    I do see that.

21                    MR. EKELAND:  And if we could go to the

22   next page and go to Request for Production Number 1.

23                    And if we could just highlight the

24   paragraph right underneath that header.

25                    Blow it up.

1    Q.   (BY MR. EKELAND)  And you see how it says:

2   Request for Production Number 1, the request is for all

3   communications, including recordings, ESI, which is

4   short for electronically stored information, e-mails

5   phone calls, et cetera, between Dr. Guerra and any

6   investigative services she has used to look into

7   Dr. Cantu and/or Mr. Cantu [sic].

8                Did you search for that information?

9                MS. PEERY:  Objection, form.

10   A.    Yes.

11   Q.   (BY MR. EKELAND)  When did you do that search?

12   A.   I don't recall.

13   Q.   Was it in the last month?

14                MS. PEERY:  Objection, form.

15   A.    No.

16   Q.   (BY MR. EKELAND)  Was it the in last six

17   months?

18                MS. PEERY:  Objection, form.

19   A.    I honestly do not recall.

20   Q.   (BY MR. EKELAND)  Do you recall what you did

21   to search for the information?

22                MS. PEERY:  Objection, form.

23   A.    I looked for e-mails that were related to

24   Digital Forensics and provided anything that I had

25   found to my lawyers.

1    Q.   (BY MR. EKELAND)  And did you look at anything

2  else besides e-mails?

3              MS. PEERY:  Objection, form.

4    A.   No.

5    Q.   (BY MR. EKELAND)  Did you have any third-party

6  vendor or anybody else come in to help you with your

7  searches?

8              MS. PEERY:  Objection, form.

9    A.   No.

10    Q.   (BY MR. EKELAND)  Did your lawyers have

11  anybody come in and search for you?

12              MS. PEERY:  Objection, form.

13    A.   No.

14    Q.   (BY MR. EKELAND)  Has anybody else besides you

15  searched for information on your devices and your

16  Web-based accounts or anything else besides you?

17              MS. PEERY:  Objection, form.

18    Q.   (BY MR. EKELAND)  You can answer.

19    A.   Not -- not in response to this lawsuit, no.

20    Q.   In response to other lawsuits?

21              MS. PEERY:  Objection, form.

22    A.   No.  I was referring to the function that

23  Digital Forensics did back in 2018 on my computer.

24  That was the only other time.

25    Q.   (BY MR. EKELAND)  Have you deleted any files,

Page 83

1   messages, recordings, texts at any time that are

2   related to this matter?

3       A.   No.

4       Q.   Are you aware of anyone else having done so?

5       A.   No.

6                MS. PEERY:  Objection, form.

7       Q.   (BY MR. EKELAND)  And directing your attention

8   to the sentence under Request for Production Number 2,

9   do you see how it says Request for Production Number 2,

10  it says the request is for recordings, transcripts

11  and/or records of communication between Dr. Guerra,

12  Dr. Cantu and/or Mrs. Cantu.

13               Did you search for that information?

14               MS. PEERY:  Objection, form.

15      A.   Yes.

16      Q.   (BY MR. EKELAND)  What did you search?

17               MS. PEERY:  Objection, form.

18      A.   Any communications that I've had with

19  Dr. Cantu or Mrs. Cantu.

20      Q.   (BY MR. EKELAND)  And did you find

21  communications?

22               MS. PEERY:  Objection, form.

23      A.   Yes.  And those have been provided.

24      Q.   All of them?

25               MS. PEERY:  Objection, form.

1     A.   Yes.

2     Q.   (BY MR. EKELAND)  Do you recall the search

3   terms you used when you searched for this information?

4              MS. PEERY:  Objection, form.

5     A.   I do not.

6     Q.   (BY MR. EKELAND)  Were you provided with any

7   search terms by your lawyers?

8              MS. PEERY:  Objection, form.

9     A.   No.

10    Q.   (BY MR. EKELAND)  Were you provided with any

11  kind of guidance at all on how to conduct your search

12  for information in relation to our discovery requests?

13             MS. PEERY:  Objection, form.

14             And I'm going to instruct you not to

15  answer with respect to any privileged communications

16  between myself and Ricardo.

17             MR. EKELAND:  Are you instructing the

18  witness not to answer?

19             MS. PEERY:  I'm instructing her not to

20  answer to the extent that it's requesting any

21  privileged communications between Dr. Guerra and her

22  attorneys regarding instructions.

23             MR. EKELAND:  Yeah, I'm not asking for

24  the subject matter contents.  I'm asking if she

25  received any guidance from --

1              MS. PEERY:  And I'm -- I'm still going

2    to --

3              MR. EKELAND:  So let me finish the

4    question and you can put the privilege objection on and

5    we can move on.

6    Q.   (BY MR. EKELAND)  So I'm asking, Dr. Guerra,

7    if you have received at any point any guidance from

8    your lawyers on how to conduct a search for information

9    responsive to our discovery requests?

10             MS. PEERY:  And I am objecting as

11   privileged and instructing the witness not to answer.

12   Q.   (BY MR. EKELAND)  Moving on to Request for

13   Production Number 3 and the sentence under that.

14             And you see how the request is for

15   contracts Dr. Guerra signed with any investigative

16   service, including Detective.com and Digital Forensics,

17   LLC.

18             And you've searched for all the

19   information responsive to that request?

20             MS. PEERY:  Objection, form.

21   Q.   (BY MR. EKELAND)  You can answer.

22   A.   Yes.

23   Q.   And you produced everything that you found in

24   that search?

25             MS. PEERY:  Objection, form.

1     A.    Yes.

2     Q.    (BY MR. EKELAND)  And moving to Request for

3  Production Number 4, and you say -- it says:  All

4  statements such as bank statements, receipts, cash,

5  check withdrawals containing evidence Dr. Guerra paid

6  for her counsel Andrew Del -- I don't know how to say

7  the last name -- Cueto.

8              Did you search for information responsive

9  to that request?

10              MS. PEERY:  Objection -- objection, form.

11              I'm instructing the witness not to

12  answer.  The court has already ruled on this request

13  for production and has sustained our objection.

14     Q.    (BY MR. EKELAND)  Okay.  That's -- but my

15  question is did you search for information responsive

16  to this request?

17              MS. PEERY:  Same objection.

18              Same instruction.

19              MR. EKELAND:  You're instructing the

20  witness to answers -- not to answer based on what?

21              MS. PEERY:  Based on the court's ruling.

22              MR. EKELAND:  Which is what?

23              MS. PEERY:  He sustained their objection

24  to this production -- to this request for production.

25              MR. EKELAND:  And you're instructing the

1    witness not to answer on that basis?

2                     MS. PEERY:  Yes.

3        Q.   (BY MR. EKELAND)   Okay.   Now let's go to

4    Request for Production Number 5.

5                     And you can see how it says request:

6    Provide all -- provide receipts and all records related

7    to the purchase of the iPads for your daughters

8    referenced in your counterclaims and any evidence which

9    shows you were searching for the lost or missing iPad.

10                    Have you searched for information

11   responsive to this request?

12                    MS. PEERY:  Objection, form.

13       A.   Yes.

14       Q.   (BY MR. EKELAND)  And have you produced the

15   information that you found in that search?

16       A.   There was no evidence to produce.

17       Q.   So it's your testimony here today that you've

18   got no evidence of or related to the purchase of the

19   iPads for your daughters?

20                    MS. PEERY:  Objection, form.

21       A.   I do not have receipts for purchase of an

22   iPad.

23       Q.   (BY MR. EKELAND)  What do you have?

24       A.   I did not have a receipt --

25                    MS. PEERY:  Objection, form.

1      A.    -- for the purchase of an iPad.

2      Q.    (BY MR. EKELAND)  Do you have any record of a

3  purchase of the iPads?

4            MS. PEERY:  Objection, form.

5      A.    No.

6      Q.    (BY MR. EKELAND)  Moving on to Request for

7  Production Number 6.

8            And there you can see it requests all

9  documents and communications between you, Dr. Guerra

10  and Digital Forensics Corporation, LLC.

11            Did you search for all documents and

12  communications responsive to Request Number 6?

13      A.    Yes.

14      Q.    And you produced all those communications and

15  documents that you found in your search to us.  Is that

16  true?

17      A.    Yes.

18      Q.    Let's go to Request Number 7.  And you see

19  that Request Number 7 is for all documents and

20  communications concerning this matter which you will

21  raise, use or rely on at trial.

22            Did you search for this information?

23            MS. PEERY:  Objection, form.

24      Q.    (BY MR. EKELAND)  You can answer.

25      A.    I believe that anything that will be raised or

1   introduced in trial will be between my attorney and I

2   so as far as everything that I have in my possession, I

3   have provided to my attorneys.

4       Q.   (BY MR. EKELAND)   Let's go to Request for

5   Production number 8.

6               And there you can see that the Request

7   for Production Number 8 is for any ESI, electronically

8   stored information, or physical evidence or

9   documentation asserting that there's been unauthorized

10  access to Dr. Cantu's and Dr. Guerra's daughters' iPad.

11              Did you search for that information?

12              MS. PEERY:   Objection, form.

13      A.   Yes.

14      Q.   (BY MR. EKELAND)   And did you find any?

15      A.   Yes.

16              MS. PEERY:   Objection, form.

17      Q.   (BY MR. EKELAND)   What was that information

18  that you found?

19      A.   It was in the previous discovery request from

20  Dr. Cantu during the family case.

21      Q.   And that's been produced to us in this case?

22      A.   I don't know if it's been produced to you.

23      Q.   But you could produce it to us?

24      A.   Uh-huh, yes.

25              MS. PEERY:   Objection, form.

1    Q.   (BY MR. EKELAND)   And you said it was

2  previously produced in the civil custody dispute.   Is

3  that correct?

4              MS. PEERY:   Objection, form.

5    A.   That is correct.

6    Q.   (BY MR. EKELAND)   And was -- what's in -- what

7  was produced in the civil custody dispute in relation

8  to -- that you're referencing there in Request Number

9  9, was that everything that you found in your search

10  when you searched this time when we made this request?

11              MS. PEERY:   Objection, form.

12    A.   Yes.

13    Q.   (BY MR. EKELAND)   So I'm moving on to Request

14  Number 10.

15              And there you can see it asks -- Request

16  for Production Number 10 asks for any ESI or physical

17  evidence or documentation asserting that Dr. Guerra

18  sustained a loss due to the unauthorized access of her

19  daughters' iPad -- iPad and/or Verizon account.

20              Did you search for that information?

21              MS. PEERY:   Objection, form.

22    A.   Yes.

23    Q.   (BY MR. EKELAND)   When did you do that?

24    A.   I don't --

25              MS. PEERY:   Objection, form.

1      A.    I don't recall when I did that.

2      Q.    (BY MR. EKELAND)  And did you find anything?

3            MS. PEERY:  Objection, form.

4      A.    I think we discussed the Verizon account

5 information, that is what I have.

6      Q.    (BY MR. EKELAND)  And that's it.

7            So you found no evidence of unauthorized

8 access to your daughters' iPad?

9            MS. PEERY:  Objection, form.

10     A.    That is not my statement.

11     Q.    (BY MR. EKELAND)  Did you find any evidence of

12 unauthorized access to your daughters' iPad?

13           MS. PEERY:  Objection, form.

14     A.    Yes, I -- previous question alluded to that

15 that it was in the discovery of Dr. Cantu during the

16 family case.

17     Q.    (BY MR. EKELAND)  But you haven't produced it

18 here.

19           MS. PEERY:  Objection, form.

20           That's not what she said.

21     A.    It has been produced.

22           MR. EKELAND:  I wasn't characterizing her

23 testimony, Counselor, I was asking her whether or

24 not --

25     Q.    (BY MR. EKELAND)  It has been produced here?

Page 92

1     A.   I have provided that information to my

2   attorneys.   Whether you have received it or not, I

3   cannot speak to.

4     Q.   You provided your attorneys everything that

5   you found in your search that was responsive to Request

6   for Production Number 10.

7               Is that what I just heard you say?

8               MS. PEERY:   Objection, form.

9     A.   Yes, sir.

10    Q.   (BY MR. EKELAND)   Let's go to Request for

11  Production Number 11.

12              There you can see that Request for

13  Production Number 11 is for any ESI or physical

14  evidence or documentation asserting that you,

15  Dr. Guerra's, computer network has been accessed

16  without -- without authorization.

17              Did you search for this ESI or physical

18  evidence that's responsive to the Request Number 11?

19              MS. PEERY:   Objection, form.

20    A.   I cannot recall this one.

21    Q.   (BY MR. EKELAND)   Do you know if any evidence

22  or ESI exists --

23              MS. PEERY:   Objection, form.

24    Q.   (BY MR. EKELAND)   -- for your claim that your

25  computer network was accessed without authorization?

1      MS. PEERY:  Objection, form.

2      A.   I do not have a client, sir, so I can't speak

3   to that.

4      Q.   (BY MR. EKELAND)  I didn't -- I didn't hear

5   what you -- I just didn't hear what you said.

6           You don't have a what?

7      A.   I said I don't have a client.  You asked me if

8   I had any information for my client.  I don't have a

9   client.

10     Q.   (BY MR. EKELAND)  I misspoke.  I misspoke.  My

11  apologies.

12          Are you aware of any evidence, ESI or

13  physical evidence, that shows that your computer

14  network was accessed without authorization?

15          MS. PEERY:  Objection, form.

16     A.   No.

17     Q.   (BY MR. EKELAND)  Moving on to Request for

18  Production Number 12.

19          And here you can see the Request is for

20  any ESI or physical evidence or documentation asserting

21  that your e-mail, Dr. Guerra's personal e-mail, has

22  been accessed without authorization.

23          Did you look for this ESI or physical

24  evidence?

25          MS. PEERY:  Objection, form.

1      A.    It is also embedded within the discovery of

2    Dr. Cantu during the family case.

3      Q.    (BY MR. EKELAND)  And have you produced that

4    in this case?

5                 MS. PEERY:  Objection, form.

6      A.    Yes.

7                 MR. EKELAND:  What are we on?

8                 Let's move to Request for Production

9    Number 13.

10     Q.    (BY MR. EKELAND)  This is a request for any

11   SI -- any ESI or physical evidence or documentation

12   obtained from accessing Mrs. Cantu's e-mail, social

13   media, personal devices and router.

14                Do you have any such information?

15                MS. PEERY:  Objection, form.

16     A.    Do not.

17     Q.    (BY MR. EKELAND)  Did you look for it?

18                MS. PEERY:  Objection, form.

19     A.    I have no ability to look for that.  I did not

20   have any of it.

21     Q.    (BY MR. EKELAND)  Request for Production

22   Number 14 is for --

23                MR. EKELAND:  You can highlight 14.

24                There you go.

25     Q.    (BY MR. EKELAND) -- a request for any ESI or

1  physical evidence or documents containing information

2  regarding defamation of your character by the Cantus.

3              Have you searched for all of that

4  information?

5              MS. PEERY:  Objection, form.

6      A.    I have.

7      Q.    (BY MR. EKELAND)  And you've produced it all

8  to us?

9              MS. PEERY:  Objection, form.

10      A.    Yes.

11      Q.    (BY MR. EKELAND)  And then let's go to Request

12  for Production Number 15.

13              It says -- Request Number 15 is for any

14  ESI or physical evidence or documents containing direct

15  threats to you or your children by the Cantus.

16              Did you search for that information?

17              MS. PEERY:  Objection, form.

18      A.    Yes.

19      Q.    (BY MR. EKELAND)  And you produced everything

20  responsive to the Request for Production Number 15?

21              MS. PEERY:  Objection, form.

22      A.    Yes.

23      Q.    (BY MR. EKELAND)  And going on to Request for

24  Production Number 16 for any bank statements or credit

25  card statements showing that you hired security for

1   your wedding.

2            Did you search for that information?

3            MS. PEERY:  Objection, form.

4   A.    I cannot recall.

5   Q.    (BY MR. EKELAND)  Do you have that

6   information?

7            MS. PEERY:  Objection, form.

8   A.    I would think that I do, but I am not certain.

9   Q.    (BY MR. EKELAND)  And who did you hire for

10  security for your wedding?

11  A.    I do not recall.

12  Q.    Do you know how much you paid them?

13  A.    I do not recall.

14  Q.    Let's go to 18.

15            Request Number 18, as you can see, is for

16  any ESI or physical evidence or documentation

17  containing your last contact and/or communication with

18  Mrs. Cantu.

19            Did you search for that information?

20            MS. PEERY:  Objection, form.

21  A.    Yes.

22  Q.    (BY MR. EKELAND)  And have you produced that

23  to us?

24            MS. PEERY:  Objection, form.

25  A.    Yes.

1    Q.   (BY MR. EKELAND)  Do you know when your last

2    contact or communication with Mrs. Cantu was?

3    A.   April 1st, 2018, outside a Pei Wei,

4    independent of legal actions that have come since that

5    time.

6    Q.   Fair enough.  Fair enough.

7            And that -- that April 1st, 2018, Pei Wei

8    interaction was roughly about two minutes long.

9    Correct?

10            MS. PEERY:  Objection, form.

11    A.   I do not recall the length of time.

12    Q.   (BY MR. EKELAND)  Do you recall testifying to

13    that length of time in your deposition in the civil

14    matter?

15    A.   I do not.  I do not recall what I said in that

16    deposition, it's been some time.

17    Q.   But you testified truthfully in that

18    deposition.  Correct?

19            MS. PEERY:  Objection, form.

20    A.   Yes.

21    Q.   (BY MR. EKELAND)  You took an oath under the

22    penalty of perjury affirming that you would testify

23    truthfully.  Correct?

24    A.   Yes.

25    Q.   Let's go to Request for Production Number 19.

1          And this is a request for any phone bills

2    and/or ESI containing calls to the police regarding

3    alleged stalking by Mrs. Cantu.

4          Did you search for that information?

5          MS. PEERY:  Objection, form.

6    A.   I do not recall if I looked for that

7    information.

8    Q.   (BY MR. EKELAND)  Do you have any phone

9    records or ESI related to this request?

10         MS. PEERY:  Objection, form.

11   A.   I do not think so.

12   Q.   (BY MR. EKELAND)  Let's go to Request for

13   Production Number 20.

14         And here you can see the request is for

15   any ESI or physical evidence or documents showing you

16   had to miss work due to alleged hackings.

17         Did you search for that information?

18         MS. PEERY:  Objection, form.

19   A.   I do not recall if I searched for it or not.

20   Q.   (BY MR. EKELAND)  Do you have that

21   information?

22         MS. PEERY:  Objection, form.

23   A.   I only have recollection of having to miss

24   work.  I don't think I have ESI or physical evidence

25   regarding that.

1    Q.   (BY MR. EKELAND)  And what days did you miss

2    work?

3    A.   I do not recall that at the moment.

4    Q.   And how exactly were you prevented from

5    working on those days?

6              MS. PEERY:  Objection, form.

7    A.   Because I had to respond and hire people to be

8    able to assist me such as Digital Forensics and

9    Detective.com and be able to make a police report and

10   all those other things that go along with managing when

11   there has been -- spending time on the phone with

12   Verizon fraud.  Those are ways that I had to not be

13   focused on my work in order to respond.

14   Q.   (BY MR. EKELAND)  How long did you spend on

15   the phone with Verizon fraud?

16             MS. PEERY:  Objection, form.

17   A.   It was more than one occasion, each time

18   probably my guess is 20, 30 minutes each time.

19   Q.   (BY MR. EKELAND)  And you have phone records

20   of this?

21             MS. PEERY:  Objection, form.

22   A.   I don't have phone records of it that I'm

23   aware of.

24   Q.   (BY MR. EKELAND)  Do you have any record of

25   those phone conversations at all?

1            MS. PEERY:  Objection, form.

2       A.   I do not recall.

3       Q.   (BY MR. EKELAND)  Have you searched for them?

4            MS. PEERY:  Objection, form.

5       A.   I have not.

6       Q.   (BY MR. EKELAND)  You said it took time to

7   hire DFC.  How much time did it take to hire DFC?

8       A.   I would imagine I probably was on the phone

9   with them and then of course to arrange payment, a

10  total of a few hours to make the entire process work

11  out.

12      Q.   In one day?

13           MS. PEERY:  Objection, form.

14      A.   I do not recall.  Most likely.

15      Q.   (BY MR. EKELAND)  Do you have records of your

16  phone calls and interactions with DFC that would

17  document the time that you spent talking to them?

18           MS. PEERY:  Objection, form.

19      A.   I do not know if I still have this as of this

20  date.

21      Q.   (BY MR. EKELAND)  And you chose when to

22  contact DFC.  Correct?

23           MS. PEERY:  Object to form.

24      A.   I think I'm not understanding the question

25  very well.

1    Q.   (BY MR. EKELAND)  You picked the time.  You

2   picked the time when you contacted DFC.  Correct?

3                  MS. PEERY:  Objection, form.

4    A.   Yes, I -- I picked the time to call them.

5   Yes, sir.

6    Q.   (BY MR. EKELAND)  And then Detectives.com, how

7   long did it take for you to hire Detectives.com?

8    A.   I would imagine about -- my recollection is

9   going to be 30 minutes or so.  20, 30 minutes maybe.

10    Q.   Right.  Because you can hire them through

11   their Web site.  Correct?

12                  MS. PEERY:  Objection, form.

13    A.   I -- yes, that is, but it included a

14   conversation and payment.

15    Q.   (BY MR. EKELAND)  But you had a phone call

16   with them?

17    A.   Yes.

18    Q.   Do you remember who the phone call was with?

19    A.   No.  I believe you asked me that already, sir.

20    Q.   Okay.  Anything else that we haven't discussed

21   here that you say caused you to miss work?

22                  MS. PEERY:  Objection, form.

23    A.   As with anyone else going through similar

24   situations, it's an extremely super stressful situation

25   which made it difficult to focus on working when trying

1    to manage.  There was a lot of stuff going on at that

2    time in our family.

3         Q.   (BY MR. EKELAND)  But your claim that the

4    hacks, the alleged hacks prevented you from going to

5    work is based on the fact that -- the facts that you

6    had to spend time to hire DFC and Detectives.com and

7    spend time on the phone with Verizon.  Is that correct?

8                   MS. PEERY:  Objection, form.

9         A.   That is inclusive and then also contacting the

10   Web sites that were fraudulently signed up, trying to

11   get those taken down also took time.

12        Q.   (BY MR. EKELAND)  And you had to do that

13   during your work hours?

14                  MS. PEERY:  Objection, form.

15        A.   Those were being done during working hours,

16   yes, sir.

17        Q.   (BY MR. EKELAND)  But did you have to do them

18   during your work hours?

19                  MS. PEERY:  Objection, form.

20        A.   That was when they were done.  I can't tell

21   you if I had to or not, I don't know, sir.

22        Q.   (BY MR. EKELAND)  You chose to do them during

23   your work hours.

24                  MS. PEERY:  Objection, form.

25        A.   That is when they were being done, yes, sir.

1    Q.   (BY MR. EKELAND)  And you did it of your own

2  choice?

3                MS. PEERY:  Objection, form.

4    A.   It was not my choice to manage the situation,

5  sir.

6    Q.   (BY MR. EKELAND)  It was your choice when to

7  take time to manage the situation.  Correct?

8                MS. PEERY:  Objection, form.

9    A.   I did -- I did call to manage the situation

10 that was constantly changing every day.

11   Q.   (BY MR. EKELAND)  But nobody told you when you

12 were supposed to call.  Correct?

13   A.   That's correct.

14                MS. PEERY:  Form.

15   Q.   (BY MR. EKELAND)  You weren't following any

16 orders from anybody else.  Correct?

17                MS. PEERY:  Objection, form.

18   A.   Yeah, that's correct.

19   Q.   (BY MR. EKELAND)  And you manage your own

20 time.  Correct?

21                MS. PEERY:  Objection, form.

22   A.   Yes.

23                MR. EKELAND:  If we could go to Request

24 for Production Number 21.  I don't have the exhibit up

25 anymore.

1          Oh, there we go.

2     Q.   (BY MR. EKELAND)  And Request for Production

3   Number 21 asks for any ESI or physical evidence or

4   documents that show your e-mail and name are used to

5   set up online profiles/accounts on your behalf.

6          And you've searched for that information?

7          MS. PEERY:  Objection, form.

8     A.   Yes.

9     Q.   (BY MR. EKELAND)  And you've produced

10  everything that you have that's responsive to this

11  request?

12          MS. PEERY:  Objection, form.

13     A.   Yes.

14     Q.   (BY MR. EKELAND)  And then let's go to Request

15  for Production Number 22.

16          And you see Request for Production Number

17  22 is the request for any ESI or physical evidence or

18  documents that your personal e-mail or e-mail accounts

19  were accessible through your daughters' iPad.

20          Have you searched for that information?

21          MS. PEERY:  Objection, form.

22     A.   Yes.

23     Q.   (BY MR. EKELAND)  And you've produced

24  everything that's responsive to this request to us?

25          MS. PEERY:  Objection, form.

1      A.   It has been produced to my attorneys, yes.

2      Q.   (BY MR. EKELAND)  Everything responsive to

3   this request that you found you produced to your

4   attorneys.  Is that correct?

5      A.   Yes.  Yes.

6      Q.   Request for Production Number 23.

7            And you can see that this is for any ESI

8   or physical evidence or documents containing phone

9   records from April 1, 2018, to April 2nd, 2018.

10           Did you search for this information?

11           MS. PEERY:  Objection, form.

12     A.   I do not recall if I did search this or not.

13     Q.   (BY MR. EKELAND)  Do you have phone records

14  from April 1st, 2018, to April 2nd, 2018?

15     A.   I am not sure what you mean by phone records.

16  Like phone calls?  I don't know if I still have that

17  anymore.

18     Q.   Do you keep your phone bills?

19     A.   No.

20     Q.   Can you access your phone bills with your

21  phone company?

22     A.   I cannot access them online anymore.

23     Q.   How can you access them?

24           MS. PEERY:  Objection, form.

25     A.   I do not know.

1     Q.   (BY MR. EKELAND)  Have you tried to access

2   them in response to our requests?

3              MS. PEERY:  Objection, form.

4     A.   I do not recall.

5     Q.   (BY MR. EKELAND)  So I just want to be clear

6   it's your testimony that you -- to the best of your

7   recollection, you have not done a search for

8   information responsive to Request Number 23?

9              MS. PEERY:  Objection, form.

10     A.   I -- my clarification, sir, is that I don't

11  recall.

12     Q.   (BY MR. EKELAND)  You don't recall whether or

13  not you've done a search for responsive information to

14  Number 23?

15             MS. PEERY:  Objection, form.

16     Q.   (BY MR. EKELAND)  Let's go on.

17             MR. EKELAND:  You're really soft, I'm

18  hearing your objections to form, but you might just

19  want to be a little bit louder for the court reporter.

20             And I think there was an objection to

21  form for almost all the last questions just in case

22  there's any question on that.

23     Q.   (BY MR. EKELAND)  Request for Production

24  Number 24.

25             This is a request for any ESI or physical

1   evidence or documentation including any hardware or

2   electronic devices or software given to DFC, Digital

3   Forensics Corporation, for forensic analysis or any

4   other analysis.

5                   Did you search for everything responsive

6   to this request?

7                   MS. PEERY:  Objection, form.

8        A.   Yes.

9        Q.   (BY MR. EKELAND)  And did you produce

10   everything you found to us?

11                   MS. PEERY:  Objection, form.

12       A.   It has been provided for my attorneys.

13       Q.   (BY MR. EKELAND)  Everything you found you

14   provided to your attorneys.

15                   MS. PEERY:  Objection, form.

16       Q.   (BY MR. EKELAND)  Is that correct?

17       A.   Yes.

18       Q.   And the Request Number 25 is a request for all

19   documents related to your recent settlement with

20   Humana.

21                   And I'm assuming counsel is going to make

22   the previous objection if she'd like to go do that.

23                   MS. PEERY:  Prior objection and

24   instruction regarding the settlement with Humana.

25       Q.   (BY MR. EKELAND)  So --

1              MS. PEERY:  And in addition, objection
2     based on the court's prior sustaining of our objection
3     to this request.
4              MR. EKELAND:  Sorry.  I had a phone call
5     coming in on my computer.  Ms. Peery, I think you said
6     that your objections, if I heard them correctly, were
7     the prior objection about the settlement privilege or
8     whatever we termed it and also that the court has
9     already ruled on this request.  Is that correct?
10             MS. PEERY:  Yes, the court has sustained
11    our objection to this request.
12             MR. EKELAND:  That is it for Exhibit T.
13             I would like to take a 10-minute break to
14    see if I have any other questions, but I don't expect
15    this to go much longer even if I do.  So shall we just
16    take 10?
17             MS. PEERY:  Do you need the full 10 or --
18             MR. EKELAND:  I would like to take the
19    full 10, yeah, I just want to make sure I've got
20    everything I think I've gotten.
21             MS. PEERY:  All right.  Can we say 12:30?
22             MR. EKELAND:  Yeah.  Let's do 12:30,
23    that's fine.
24             VIDEOGRAPHER:  Off the record.  We're
25    off.

1                    (A recess was taken.)

2                    VIDEOGRAPHER:  We're back on the video

3    record.  This is media file number 3.  The time is

4    1:30 p.m.

5                    MR. EKELAND:  Dr. Guerra, thank you for

6    your testimony.  I have no further questions for you.

7                    I pass the witness.

8                    MS. PEERY:  We'll reserve our questions

9    for time of trial.

10                    REPORTER:  Will she read and sign her

11   deposition?

12                    MS. PEERY:  Yes, if you can send it to

13   me.

14                    REPORTER:  Will you need a copy as well

15   for yourself?

16                    MS. PEERY:  Yes.

17                    VIDEOGRAPHER:  Going off the video record

18   at 1:30 p.m.

19                    REPORTER:  And then what kind of

20   transcript would you like, Mr. Ekeland?

21                    MR. EKELAND:  E-tran, let's do that.

22                    (Deposition concluded.)

23

24

25

Page 110

CHANGES AND SIGNATURE

PAGE   LINE    CHANGE                    REASON FOR CHANGE

     I, SANDRA GUERRA, have read the foregoing
deposition and hereby affix my signature that same is
true and correct, except as noted herein.

                    _____
                    SANDRA GUERRA

     SUBSCRIBED AND SWORN TO before me this the
_____ day of _____, 2022.

                         SEAL:

_____
NOTARY PUBLIC
EXPIRES:_____

```
 1              UNITED STATES DISTRICT COURT
 2               WESTERN DISTRICT OF TEXAS
 3                      SAN ANTONIO
 4
 5   MELODY JOY CANTU AND DR.
     RODRIGO CANTU,
 6
              Plaintiffs,
 7
     v.                          5:20-CV-0746JKP-HJB
 8
     DR. SANDRA GUERRA AND DIGITAL
 9   FORENSICS CORPORATION, LLC,
10            Defendants.
11
12        CERTIFICATE OF COMPLETION OF DEPOSITION
13        I, TRUENEA TEASLEY, CSR #8719, DO HEREBY CERTIFY
     that on July 21, 2022, the deposition of Sandra Guerra,
14   M.D., was taken before me at the request of, and sealed
     original thereof retained by:
15
16   For the Plaintiffs (Remotely):
          Tor Ekeland
17        Tor Ekeland Law, PLLC
          30 Wall Street, 8th Floor
18        New York, New York 10005
          tor@torekeland.com
19
          I FURTHER CERTIFY that copies of this certificate
20   have been mailed to or delivered to all counsel, and
     parties to the proceedings not represented by counsel,
21   appearing at the taking of the deposition:
22   For the Defendant (Remotely):
          Brandy Peery
23        Cedillo & Mendoza, Inc.
          755 East Mulberry, Suite 250
24        San Antonio, Texas 78212
          beery@lawdcm.com
25
```

1        I FURTHER CERTIFY that examination of this
transcript and signature of the witness was reserved by
2   the witness and all parties present.  On
_____, 2022, a letter was mailed or
3   delivered to Ms. Brandy Peery regarding obtaining
signature of the witness, and corrections, if any, were
4   appended to the original and each copy of this
deposition.

5

6        I FURTHER CERTIFY that the cost of the original
and one copy of the deposition, including exhibits, to
7   Mr. Tor Ekeland, is $_____.

8

9        I FURTHER CERTIFY that I did administer the oath
to the witness herein prior to the taking of this
10  deposition; that I did thereafter report in
stenographic shorthand the questions and answers set
11  forth herein, and the foregoing is a true and correct
transcript of the proceeding had upon the taking of
12  this deposition to the best of my ability.

13

14       I FURTHER CERTIFY that I am neither employed by
nor related to any of the parties or attorneys in this
15  case, and that I have no interest in the final
disposition of this case in any court.

16

17

18                          _____

                            TRUENEA TEASLEY, CSR/RPR/CCR
19                          CSR No. 8719
                            License Expires:  09-30-2022
20

21

22

23

24

25