# Exhibit D

Melody Cantu                                                    Pages 1

```
 1              IN THE UNITED STATES DISTRICT COURT
              FOR THE WESTERN DISTRICT OF TEXAS
 2                    SAN ANTONIO DIVISION

 3  MELODY JOY CANTU and DR.      )
    RODRIGO CANTU,                )
 4                                )
              Plaintiffs,         )
 5                                ) CIVIL ACTION
    VS.                           )
 6                                ) NO.: 5:20-CV-00746-JKP
    DR. SANDRA GUERRA and         ) (HJB)
 7  DIGITAL FORENSICS             )
    CORPORATION, LLC,             )
 8                                )
              Defendants.         )
 9

10         ------------------------------------

11           ORAL AND VIDEOTAPED DEPOSITION OF

12                  MELODY JOY CANTU

13                     (VIA ZOOM)

14                   JULY 16, 2022

15         ------------------------------------

16      ORAL AND VIDEOTAPED DEPOSITION OF MELODY JOY CANTU,

17  produced as a witness at the instance of the DEFENDANT,

18  and duly sworn, was taken in the above-styled and

19  numbered cause on July 16, 2022 from 9:06 o'clock a.m.

20  to 2:17 o'clock p.m., Via Zoom, before

21  DEBBIE S. LONGORIA, CSR in and for the State of Texas,

22  reported by machine shorthand, pursuant to the Federal

23  Rules of Civil Procedure.

24

25
```

```
 1                    A P P E A R A N C E S

 2

 3  FOR THE PLAINTIFFS:

 4       TOR EKELAND (Via Zoom)
         TOR EKELAND LAW, PLLC
 5       30 WALL STREET, 8TH FLOOR
         NEW YORK, NEW YORK 10005
 6       (718) 737-7264
         tor@torekeland.com
 7
    FOR THE DEFENDANTS DR. SANDRA GUERRA and DIGITAL
 8  FORENSICS CORPORATION, LLC:

 9       BRANDY C. PEERY (Via Zoom)
         RICARDO G. CEDILLO (Via Zoom)
10       DAVIS, CEDILLO & MENDOZA, INC.
         755 E. MULBERRY, SUITE 250
11       SAN ANTONIO, TEXAS 78212
         (210) 822-6666
12

13  ALSO PRESENT:

14       KYLE LABYER, Videographer (Via Zoom)
         KATHLEEN N. FOLKS (Via Zoom)
15       DR. RODRIGO CANTU (Via Zoom)
         DR. SANDRA GUERRA (Via Zoom)
16       NICOLE GUITELMAN (Via Zoom)

17

18

19

20

21

22

23

24

25
```

LEXITAS

```
 1                          INDEX

 2                                                    PAGE

 3  Appearances........................................   2

 4  MELODY JOY CANTU
         Examination by Ms. Peery......................   4
 5
    Reporter's Certificate............................222
 6

 7                         EXHIBITS

 8  NO.       DESCRIPTION                              PAGE
```

```
 9  Ex.  1    Notice of Deposition for Melody Joy Cantu.221
    Ex.  2    Plaintiffs' Initial Disclosures...........221
10  Ex.  3    First Amended Complaint...................221
    Ex.  4    4/13/18 letter from Nicholas "Nico" LaHood221
11  Ex.  5    Text messages.............................221
    Ex.  6    Nate Bellinger's LinkedIn profile.........221
12  Ex.  7    Text messages.............................221
    Ex.  8    4/13/18 letter from Tina Torres, PLLC.....221
13  Ex.  9    10/9/18 letter from Randolph A. Pollock...
              MA, LPC...................................221
14  Ex. 10    Investigation Report......................221
    Ex. 11    SAPD report...............................221
15  Ex. 12    Petitioner's Response to Respondent's.....
              Requests for Disclosure...................221
16  Ex. 13    Notice of Deposition for Dr. Rodrigo Cantu221
    Ex. 14    9/25/19 letter from Tor Ekeland Law, PLLC.221
17  Ex. 15    10/15/19 letter from Davis, Cedillo.......
              & Mendoza.................................221
18  Ex. 16    3/11/20 letter from Tor Ekeland Law, PLLC.221
```

```
19

20

21

22

23

24

25
```

1          MR. EKELAND:  Ms. Peery, when you move

2   closer like you just did, I can hear it.  It seems to be

3   when you lean back or something --

4          MS. PEERY:  Okay.

5          MR. EKELAND:  -- it gets really low.

6          MS. PEERY:  It's probably my microphone

7   on here, so I'll try to stay close, but thank you for

8   letting me know.

9      Q.   (By Ms. Peery) Let me re-ask my question.  The

09:30 10   medication that you are taking, Mrs. Cantu, is that to

11   treat both your major depressive disorder and your panic

12   disorder?

13      A.   I am not certain what it does.  I took it on

14   the recommendation of my treating practitioner.

09:30 15      Q.   Is the medication that you're taking, does

16   it -- will it affect your ability to understand my

17   questions and answer them truthfully?

18      A.   No, it does not.

19      Q.   Okay.  Are you on any other medication today

09:31 20   that's going to affect your ability to understand my

21   questions and answer them truthfully?

22      A.   No.

23      Q.   Do you own a gun?

24      A.   Yes.

09:31 25      Q.   How many?

1      A.   I don't know.

2      Q.   You don't know how many guns you own?

3      A.   We have several.

4                MR. EKELAND:   Object to form.

09:31  5      Q.   (By Ms. Peery) More than two?

6      A.   I would say so.

7      Q.   More than five?

8      A.   I don't know.

9      Q.   Did you purchase the guns?

09:31  10     A.   I believe I did.

11     Q.   When?

12     A.   Gosh, I don't remember.  I've had one of them

13 for a while.

14     Q.   Okay.  Since prior to 2018?

09:31  15     A.   Yes.

16     Q.   Do you carry a gun in your purse?

17     A.   No.

18     Q.   Have you ever carried a gun in your purse?

19     A.   No.

09:32  20     Q.   Do you carry a gun in your car?

21     A.   No.

22     Q.   Have you ever carried a gun in your car?

23     A.   No.  Except to the gun range, no.  I got a

24 concealed carry license because it was free when I

09:32  25 purchased my gun because I didn't know how to use it, so

1 I got the free classes.  And so, that's how I got my

2 concealed carry, but it was expired now.

3      Q.   When did you get your concealed carry license?

4      A.   Sometime after I was divorced from Mr. Ross.

09:32  5 Someone kicked in our door and so I purchased a gun for

6 home protection.

7      Q.   When did you divorce Mr. Ross?

8      A.   In 2011.

9      Q.   Okay.

09:32 10      A.   Or '12, I don't remember.  I'm sure you have

11 the paperwork.

12      Q.   What did you do to prepare for this deposition

13 today?

14      A.   I met with my attorney.

09:33 15      Q.   Okay.  When?

16      A.   Yesterday.

17      Q.   For how long?

18      A.   I don't remember.

19      Q.   More than an hour?

09:33 20      A.   Sure.

21      Q.   More than two hours?

22      A.   Yes.  We were also getting discovery ready for

23 you.

24      Q.   Okay.

09:33 25           MS. PEERY:  Nonresponsive.

1  and the girls?

2      A.    Yes.

3      Q.    How old were the girls?

4      A.    I don't remember.  We'd have to do some

10:57  5  serious math because I don't remember their birthdays.

6  I'm sorry.

7      Q.    They were minors, correct?

8      A.    I believe so.

9      Q.    Okay.  When you went over to talk to them,

10:58  10  what did you say?

11     A.    I said, "Hi, Maya, Sofia and Sandy, Happy

12  Easter."

13     Q.    Okay.  So, Dr. Guerra was there?

14     A.    Yes, I think --

15     Q.    And then --

16     A.    -- I said that.

17     Q.    And then what happened?

18     A.    They said "Happy Easter."  And I said, "I'm

19  here today because David and I have been in a secret

10:58  20  relationship.  He's afraid that you -- and I looked at

21  the girls -- won't love him anymore, and you -- and then

22  I looked at Sandra -- won't let him see his girls."  And

23  Sandra got very upset, started to walk to her car,

24  turned back and said, "Some of us don't appreciate being

10:58  25  ambushed, Dave."  And then she continued to walk to her

1  car.  And he said, "Sandra, take the girls."  Because

2  the girls were standing by David where -- I was on the

3  opposite side of David, and the girls went to their car,

4  David waited, I stayed with David.

10:59  5              After Sandra was in her car, I followed

6  David over to his car where she had already started her

7  car and actually aimed it at me twice because I was

8  standing on the side of his door.  She backed up twice

9  and aimed the car at me and then drove off, and then

10:59  10  David left.  And I realized at that time when Sandra

11  said "I don't appreciate being ambushed" that it was a

12  surprise to her and that was a little bit of a shock.

13  It was awkward.

14      Q.   How did the girls react?

10:59  15      A.   They didn't say -- they said "Happy Easter"

16  and then nobody got time to say anything because Sandra

17  said "I don't appreciate being ambushed."  And I was

18  looking at her, so I didn't look to their reaction, but

19  nobody was crying that I saw, nobody was upset or saying

11:00  20  anything.

21      Q.   Were you upset?

22      A.   I was scared.  I was nervous.  This was a big

23  step.  David had gone through a lot of therapy for this,

24  and so very apprehensive and nervous.

11:00  25      Q.   Were you crying?

1 family so -- from his family and Sandra, and I chose to

2 move on.  I actually went to my therapist the next day

3 to take those steps to move on.

4     Q.   (By Ms. Peery) Which therapist did you go to?

11:04  5     A.   Randy Pollock.

6     Q.   Okay.

7          MS. PEERY:  Kyle, can you please bring

8 this down and pull up Exhibit 5?  You're probably going

9 to need to make these a little bit larger to see.

11:05 10          THE WITNESS:  Yes, please.

11          MS. PEERY:  Kyle, do you mind just kind

12 of scrolling slowly through this so the witness can see

13 the exhibit?

14     Q.   (By Ms. Peery) We'll go through the messages,

11:05 15 but I just want you to see the entire exhibit.

16     A.   Uh-huh.

17          MS. PEERY:  Thank you, Kyle.  If you

18 scroll back to the first page.

19     Q.   (By Ms. Peery) Do you recognize --

11:06 20     A.   Yes, I do.

21     Q.   -- this correspondence?

22     A.   Uh-huh.

23     Q.   What is it?

24     A.   It's what I sent her on April 1st.

11:06 25     Q.   Who's "her"?

1      A.    Dr. Guerra.

2      Q.    Okay.  And how did you send this?

3      A.    Facebook Messenger, and my head's at the top.

4      Q.    Okay.  And there's a timestamp there.  You

11:06  5  started sending this at 9:34 p.m., correct?

6      A.    Correct.  I believe she said that I did it at

7  3:00 a.m. in her complaint, but it's 9:34, you're right.

8      Q.    How long -- how long was this after the

9  incident at Pei Wei?

11:07 10    A.    I want to say the incident at Pei Wei,

11  around -- it was still light outside.  I want to say it

12  was like early, 8:15 maybe, 8:20.

13     Q.    Okay.  So, this was about an hour later?

14     A.    Uh-huh.

11:07 15    Q.    How many messages did you send?

16     A.    Well, I don't know how to use periods and I

17  wasn't great at messaging, so I hit enter instead.  So

18  we'd have to count them, I don't know.

19     Q.    Okay.  And my prior question when I asked you

11:07 20  if you started sending these about an hour after the Pei

21  Wei incident, was your answer yes?

22     A.    Yes.

23     Q.    Okay.  Let's start with the first message.

24  "None of it is a lie.  We have been together.  I was

11:08 25  next to him in --

1      A.    September.

2      Q.    -- September when he lied to you about dating

3 me.  I love David and I apologized to the girls."  What

4 did you apologize to the girls for?

11:08  5                  MR. EKELAND:  Objection.

6                  THE WITNESS:  Well, okay.  Tor, may I

7 answer?

8                  MR. EKELAND:  Yeah, you can answer.

9                  THE WITNESS:  Okay.  Sandra did not agree

11:08 10 with the way that David chose to have them interact with

11 me, and so I had apologized because maybe as a first

12 time stepmom I could have done things a little bit

13 differently.  That was in September of 2015.

14      Q.    (By Ms. Peery) You apologized to the girls in

11:08 15 September of 2015?

16      A.    Yes.  And right there when it says "I was next

17 to him in September," that's actually referencing

18 Sandra's phone call in September of 2017 when she asked

19 if we were dating.  So it says, "He lied to you about

11:09 20 dating me" because I was sitting next to her -- or next

21 to him when she called and I could hear it.

22      Q.    Okay.  And it says, "In all this, I want you

23 to know I read the letters you wrote in the divorce."

24      A.    Her divorce, yes.  I read the letters that she

11:09 25 wrote David in the divorce.

1      Q.    The letters she wrote David in the divorce

2 that were filed with the court, is that what you're

3 referencing?

4      A.    No, just letters that David had shared with

11:09  5 me.

6      Q.    Okay.  She had sent letters to David that he

7 showed to you?

8      A.    Yes.

9      Q.    Okay.

11:09 10           MS. PEERY:   Kyle, would you mind

11 scrolling down, please, to the next page.

12      Q.    (By Ms. Peery) Mrs. Cantu, do you still have

13 copies of those letters?

14      A.    I'd have to go and look, but maybe.

11:10 15      Q.    "I read how much you hurt and how hard it was

16 to deal with all the emotional, verbal abuse and

17 control.  I went through it all exactly the way you

18 did."

19      A.    Yes.

11:10 20      Q.    What are you --

21      A.    I empathized with her because she had wrote

22 that.  It was very -- David was very difficult to live

23 with.  She had wrote that -- I guess that they would

24 have an interaction where he was not kind to her and she

11:10 25 would accept his apology and 24 hours later he would do

1 the same thing.  And he would not take any consideration

2 for the fact that he had just apologized or she would

3 convey the feelings about it.  And so, I had experienced

4 that same -- same thing and it was hard.

11:10   5    Q.   Dr. Cantu was emotionally abusive to you?

6    A.   I think -- I think that he was very cruel at

7 times, yes.

8    Q.   And was Dr. Cantu verbally abusive to you?

9              MR. EKELAND:  Objection.

11:11  10              THE WITNESS:  At times -- you'd have to

11 define what verbal abuse is for me.

12    Q.   (By Ms. Peery) I'm asking what you meant in

13 your message when you said "I read how much hurt and how

14 hard it was to deal with all the emotional, verbal abuse

11:11  15 and control.  I went through it all exactly the way you

16 did."  What did you mean by verbal abuse?

17    A.   Well, that's what Sandra had said in her

18 letter.

19    Q.   When you said "I went through it all exactly

11:11  20 the way you did," what did you mean by --

21    A.   I experienced the same --

22    Q.   Let me finish the question.

23    A.   I'm sorry, it's cutting out.

24    Q.   What did you mean by verbal abuse?

11:11  25              MR. EKELAND:  Objection.

1          THE WITNESS:  I -- David says things

2  without thinking sometimes and he doesn't remember what

3  he says, and it's not -- it's not kind sometimes, it's

4  hurtful.

11:12  5      Q.   (By Ms. Peery) There at the --

6              MS. PEERY:  Kyle, can you scroll up just

7  a little bit to the last message on this page?

8              THE WITNESS:  And I thought that she

9  would have understanding of that because she wrote about

11:12 10  it, as well.

11      Q.   (By Ms. Peery) Okay.

12              MS. PEERY:  Kyle, can you -- I'm trying

13  to see what Bates number page we're on.  I want to be on

14  147.  There you go.  At the bottom of 147, that last

11:12 15  message.  There you go.

16      Q.   (By Ms. Peery) "You do not know the verbal

17  abuse he put --

18              MS. PEERY:  And then, Kyle, scroll down,

19  please.

11:12 20      Q.   (By Ms. Peery) "I've been through more than

21  anyone should have gone --

22              MS. PEERY:  I'm sorry, Kyle, keep

23  scrolling down.

24              THE WITNESS:  Can we go -- can we go back

11:12 25  up, actually?

1       Q.    (By Ms. Peery) Let me finish my question.

2       A.    Okay.

3       Q.    "You do not know the verbal abuse he put me

4  through, the screaming, the hurtful words, the mood

11:13  5  swings."  What did Dr. -- how did Dr. Cantu verbally

6  abuse you?

7              MR. EKELAND:  Objection.

8              THE WITNESS:  He would say a lot of

9  hurtful things that weren't true.  He would lash out.

11:13  10  There was a lot of pressure on him to please his family,

11  to meet Dr. Guerra's expectations with his daughters,

12  and sometimes the pressure became too much and he would

13  lash out.

14      Q.    (By Ms. Peery) Did Dr. Cantu ever physically

11:13  15  abuse you?

16      A.    No, never.

17      Q.    Have you ever hit Dr. Cantu?

18      A.    No, never.

19              MS. PEERY:  Kyle, would you please go to

11:14  20  the Bates label 155 on this.  Right there.

21      Q.    (By Ms. Peery) "David will try to do damage

22  control, but this letter from you changed my life."

23  What letter is that?

24      A.    That's the letter Sandra wrote David.

11:14  25      Q.    Okay.  What about the letter changed your

1 life?

2     A.   I wasn't alone.  I -- I'll get there.  It's

3 just, I'm sorry, it's emotional, so if you'll give me

4 time to answer.

11:14 5     Q.   Yes, and I didn't mean to interrupt you.

6     A.   This is -- this is -- this is a very sensitive

7 matter and it is two different people that have hurt

8 from the same person, and so it is a sensitive issue.  I

9 don't -- I don't -- I don't think it would be easy for

11:14 10 anybody to talk about this.  The thing that I related to

11 Sandra about and that helped me was that she stated that

12 she had given him multiple chances, that she had tried

13 very hard in their relationship to get along and forgive

14 and forget things, that over time it built-up and it was

11:15 15 too much.

16               And when I wrote this, I was at that

17 point because -- I'm sorry -- we had tried very hard,

18 and I was having the same types of issues where he would

19 say something and then take it back -- excuse me just a

11:15 20 second.  I'm sorry.  Or say something and apologize and

21 then the pressure or anxiety would build and I would be

22 at square one.  And I would do whatever it took to try

23 to be understanding or compassionate about his

24 situation, and it just -- it wasn't -- it wasn't easy.

11:16 25               And so, I saw that in her letter and I

1  related to her in that -- and that's what this was

2  about.   And it changed me because at the end of the

3  letter, she decides to leave David.   And at that point,

4  I had decided to leave, and it was the courage she had

11:16  5  to leave David that I was relating to, so that was the

6  change.

7      Q.   When did you find this letter?

8      A.   Oh, gosh, when David and I were first married,

9  he let me read it.

11:17  10      Q.   And you had -- you had kept it?

11      A.   You cutout because of the cough, I'm sorry.

12      Q.   You kept the letter even after your divorce?

13      A.   I didn't keep it, David kept it.   It was a

14  photo of it.

11:17  15      Q.   Who took the photo of it?

16      A.   I don't remember.   I don't remember if it was

17  texted to me.   I don't remember, but that's it.

18      Q.   Well, I see some manicured fingers in that.

19  Are those David's fingers in that picture?

11:17  20      A.   I can't see any fingers, actually, because

21  it's --

22              MS. PEERY:   Kyle, can you pull it up?

23  Thank you.

24              THE WITNESS:   Those are my fingers and we

11:17  25  have may have been sitting together, but I believe I saw

1  it in 2014 or 2015.

2      Q.    (By Ms. Peery)  Okay.  And you took a picture

3  of it?

4      A.    Yes, because we were also looking at other

11:17  5  documents that were in the file cabinet that we needed,

6  so we took a picture of everything because it was going

7  to storage.

8              MS. PEERY:  Kyle, would you please scroll

9  up to Bates label 1534.  I think it's the preceding

11:18  10  page.  There we go.

11      Q.    (By Ms. Peery)  "He's been with me the whole

12  time.  I saved everything you sent to him while we were

13  dating.  You were with Ben and sending David provocative

14  pictures."

11:18  15      A.    Uh-huh.

16      Q.    Do you have provocative pictures of

17  Dr. Guerra?

18      A.    No, David did.  We saved them, but I don't

19  know if we still have them.

11:18  20      Q.    "We saved them," is that what you said?

21      A.    David had the photos.  I did not have the

22  photos.  We were married at the time.

23      Q.    I was -- I was asking about your prior

24  statement.  Your prior statement, you said "We saved

11:19  25  them," correct?

1                MR. EKELAND:  Objection.

2                THE WITNESS:  David had them.

3        Q.    (By Ms. Peery) Did you save them?

4        A.    When we were married, we chose to save them.

11:19 5   Q.    So, where did you save them?

6        A.    I believe --

7                MR. EKELAND:  Objection.

8        A.    -- David had them on a computer or on a phone.

9 I don't remember.

11:19 10  Q.    Are they on your -- on any of your devices?

11               MR. EKELAND:  Objection.

12               THE WITNESS:  No, they're not.

13

14

11:19 15

16

17

18

19

11:20 20

21

22

23

24

11:20 25

1      A.    I thought he was --

2              MR. EKELAND:   Objection.

3              THE WITNESS:   I thought he was someone

4    that worked with my husband, like some of the other

11:39 5    people that I had connected with.

6      Q.    (By Ms. Peery) When did you send this LinkedIn

7    request?

8      A.    I don't remember the exact day.

9      Q.    Is that something you can find out from your

11:39 10   LinkedIn account?

11     A.    I know that it was the night before Sandra

12   called yelling about it.

13     Q.    Okay.  So, what night did --

14     A.    I think that was the 19th or the 20th of May.

11:39 15     Q.    May what?

16     A.    2018.

17     Q.    Okay.

18              MS. PEERY:   Kyle, can you pull this down

19   and please put up Exhibit 7?  And would you mind just --

11:39 20   if you could make it a little bigger, that would be

21   great, and then kind of scroll through the entire

22   exhibit.

23              THE WITNESS:   Yes, thank you.

24              MS. PEERY:   Kyle, can you scroll to the

11:40 25   first page, please?  Thank you.

1      Q.    (By Ms. Peery) Who's Stacy?

2      A.    I believe during the phone call or right after

3  the phone call that was -- that Sandra called talking

4  about Nate, I looked on Facebook and I believe that to

11:40  5  be his ex-wife.

6      Q.    Okay.  So, is this a text message or is this a

7  Facebook Messenger?

8      A.    It's a Facebook Messenger.

9      Q.    Okay.  When did you send it?

11:41 10      A.    After the phone call.

11      Q.    Why did you send it?

12      A.    Sandra -- I was concerned about all the things

13  she was saying on that phone call, very concerned.

14      Q.    Okay.  So, you did not know Stacy --

11:41 15      A.    Not at all.

16      Q.    -- prior to sending this message?

17      A.    No.

18      Q.    And it's your testimony that you sent this

19  e-mail to someone you didn't know because you were

11:41 20  concerned?

21      A.    I was --

22              MR. EKELAND:  Objection.

23      A.    -- extremely concerned and I sent it

24  mom-to-mom after the phone call.

11:41 25      Q.    What were you concerned about?

1      A.    Well, the things Sandra was saying.

2      Q.    What was that?

3      A.    That she -- he was going to lose his

4 daughters, that -- that he lied and he needed to ask for

11:41 5 forgiveness from Sandra, that -- a lot of things went on

6 that phone call, but you know, just that day, I remember

7 all of the belongings being removed -- all of the girls'

8 belongings being removed from David's home.  And so, I

9 remember it being a huge stressor and then I remember

11:42 10 her calling saying "Now you have a -- he said "I lost my

11 wife," and she specifically said "Now you have a

12 different kind of loss."  And so, I was very worried

13 about a woman that would take her children away from

14 their dad.

11:42 15      Q.    Okay.  So, the "he" that you're referring to

16 in your testimony is Dr. Cantu?

17      A.    Correct.

18      Q.    So, you were concerned about Dr. Cantu, so you

19 sent this Facebook message --

11:42 20      A.    I was concerned about Stacy's children, to

21 correct you.  I was concerned about Stacy and Nate's

22 children.

23      Q.    But, you didn't know Stacy?

24      A.    I didn't.

11:42 25                MR. EKELAND:  Objection.

1          THE WITNESS:  No, I did not.  I knew that

2 she had children from what I saw.

3      Q.    (By Ms. Peery) From what you saw where?

4      A.    When I looked for her on Facebook.

11:43  5      Q.    Why were you specifically looking for Stacy on

6 Facebook?

7                MR. EKELAND:  Objection.

8                THE WITNESS:  Go ahead, Tor.

9                MR. EKELAND:  You can answer.

11:43 10                THE WITNESS:  Because the call and the

11 removal of items was so awful.

12      Q.    (By Ms. Peery) Were you specifically looking

13 for Nate Bellinger's wife on Facebook?

14      A.    No, I was looking for the mother of his

11:43 15 children because of what Sandra was saying on the phone

16 call.

17      Q.    Okay.

18      A.    There was -- there was a lot she said.

19      Q.    Okay.  Let's scroll down here to -- it says,

11:44 20 "Hey, Stacy, I would like to speak to you mom-to-mom

21 about the type of woman Nate has been dating.  I have

22 legitimate concerns about how she would affect you

23 children -- it says you.

24      A.    I meant to say your.

11:44 25      Q.    "I am sincere and truly worried.  Your

1  confidence in this matter is appreciated."  What do you

2  mean "your confidence in this matter"?

3                    MR. EKELAND:  Objection.

4                    THE WITNESS:  Well, I didn't want to

11:44  5  exacerbate David's situation with Sandra anymore.  I

6  mean, she was furious when she called.  She was

7  screaming -- she screamed for about an hour.

8      Q.   (By Ms. Peery) Did you -- confidence, did you

9  intend "your confidentiality"?

11:44 10                    MR. EKELAND:  Objection.

11                    THE WITNESS:  I think it's kind of the,

12  yeah, same thing, confidentiality.

13      Q.   (By Ms. Peery) In other words, you were asking

14  her to keep it between the two of you, correct?

11:44 15                    MR. EKELAND:  Objection.

16                    THE WITNESS:  Potentially, yes.

17      Q.   (By Ms. Peery) Okay.

18                    Ms. Peery:  And the next page, Kyle,

19  please.

11:45 20      Q.   (By Ms. Peery) Stacy says, "How do you know

21  Nate?"  And your response was, "Are you still married?

22  If so, he's cheating.  Would like to help.  I am coming

23  to you as a mother who's been burned before by her."

24      A.   Yes, ma'am.

11:45 25      Q.   How were you, as a mother, burned before by

1  Dr. Guerra?

2      A.   Dr. Guerra --

3                MR. EKELAND:  Objection.

4                THE WITNESS:  Go ahead, Tor.

11:45  5          MR. EKELAND:  Object, and you can answer.

6                THE WITNESS:  Dr. Guerra stated that if

7  David was ever to bring his girls around me again that

8  she would file a CPS report or take measurable action

9  against me.  She also forced our divorce and David would

11:45 10  never have a relationship with his children if he stayed

11  with me.  That was -- that was made very clear in 2015.

12  And I think anybody that's going to separate a dad from

13  their children is concerning.

14                MS. PEERY:  Can you scroll up just a

11:46 15  little bit, Kyle, so we can see the last message on this

16  page?  Yeah, on page 142.  Scroll to the bottom of 142.

17  There we go.

18                THE WITNESS:  Sorry, I have a bug in

19  here.  We have a barn and so it's getting in the way.

11:46 20      Q.   (By Ms. Peery) You say to Stacy "I have

21  recordings for you."

22      A.   Uh-huh.

23      Q.   What recordings?

24      A.   We had recordings of Sandra.

11:46 25      Q.   Video recordings?

1     A.   Voice recordings.

2     Q.   Okay.  Voice recordings of what?

3     A.   That phone call.

4     Q.   What phone call?

11:46  5     A.   That specific phone call we're discussing

6 where she screamed at David for an hour.

7     Q.   And that was the phone call on what date?

8     A.   May 20th.

9     Q.   May 20th?

11:46 10     A.   Uh-huh.

11     Q.   I'm sorry, I forgot the year.

12     A.   2018.

13     Q.   Okay.  And you still have that recording?

14     A.   Yes, ma'am.

11:46 15     Q.   Have you produced that as part of your

16 discovery responses?

17     A.   You'd have to ask Tor if we're going to be

18 producing it or if we're keeping it for, I guess, what

19 is it, impeachment.  You need to ask my counsel.

11:47 20     Q.   Okay.  So, you have not produced it?

21     A.   I don't know if we produced it or not.  I need

22 to -- I am --

23     Q.   Have you --

24     A.   I'm okay with it, I have nothing to hide, so I

11:47 25 mean.

1    Q.   Have you provided it to your attorney?

2    A.   I think we have discussed it and I think he

3 has a copy of the transcripts, but we have not reviewed

4 it.

11:47  5    Q.   Other than the May 20th, 2018 recording --

6 audio call, do you have any other recordings of

7 Dr. Guerra?

8    A.   I would need to go check, but I'm not -- and

9 I'm not certain.

11:47 10    Q.   Okay.  Do you have any video recordings of

11 Dr. Guerra?

12    A.   I have her --

13            MR. EKELAND:  Objection.

14            THE WITNESS:  Do I answer, Tor?

11:48 15            MR. EKELAND:  You can answer.

16            THE WITNESS:  I have her police video,

17 yes, where she is reporting a crime against -- that I

18 committed against her.

19            MS. PEERY:  Scroll down to the next page,

11:48 20 Kyle.

21    Q.   (By Ms. Peery) Stacy asked you, "You never

22 said how you know him."  And you said, "I'm sorry I

23 bothered you.  The woman he is dating is manipulative

24 and deceptive, I was concerned.  Sorry I contacted you."

11:48 25    A.   Yes, I did.

1    Q.    Okay.  "I'm happy to talk, not text."  Did you

2 want Stacy to call you?

3    A.    Not really.  She had already kind of given me

4 the brushoff that she wasn't interested.

11:48  5    Q.    Did you -- you -- I just -- sorry, I want to

6 go back to my prior question.  So, have you provided all

7 voice recordings to your lawyer?

8              MR. EKELAND:  Objection.

9              THE WITNESS:  Yeah.

11:49 10    Q.    (By Ms. Peery) Okay.  And the tran -- and

11 transcripts to all of these voice recordings, you've

12 provided that to your attorney, as well?

13    A.    I believe --

14              MR. EKELAND:  Objection.

11:49 15              THE WITNESS:  I believe so.

16    Q.    (By Ms. Peery) Okay.  When?

17    A.    Gosh.  I provided it in the criminal trial and

18 I provided it in -- at the beginning, probably the first

19 couple of months I knew Tor.

11:49 20    Q.    Okay.

21    A.    We had it professionally transcribed.

22    Q.    Okay.  And I should have been more clear on my

23 question when I was asking if you provided it to your

24 attorney.  Specifically this lawsuit, Mr. Ekeland's

11:49 25 representing you in this lawsuit, have you provided all

1  voice recordings of Dr. Guerra to Mr. Ekeland in this

2  lawsuit?

3       A.   I have.

4                 MR. EKELAND:  Objection.  You can answer.

11:49  5           THE WITNESS:  I have.  I don't believe

6  David's productions are due yet.

7       Q.   (By Ms. Peery) When did you provide the

8  recordings to Mr. Ekeland?

9                 MR. EKELAND:  Objection.  You can answer.

11:50 10          THE WITNESS:  At some time when he was my

11 counsel.  I don't know.  The recording was made in 2018,

12 we've had it.

13      Q.   (By Ms. Peery) When did you engage Mr. Ekeland

14 as your counsel in this lawsuit?

11:50 15      A.   In 2019 --

16                MR. EKELAND:  Objection.

17                THE WITNESS:  Sorry.  Can I answer?

18                MR. EKELAND:  Yes.

19                THE WITNESS:  In 2019 when Sandra was

11:50 20 pursuing a felony on me.

21      Q.   (By Ms. Peery) Okay.

22                MS. PEERY:  Kyle, can you -- can you

23 please go to Bates No. 145 of this exhibit?  Right

24 there.  And if you can scroll up just a little bit.

11:51 25      Q.   (By Ms. Peery) You say to Stacy, "She destroys

1 people and that will be Nate's -- it says income, I'm

2 not sure what --

3    A.    Uh-huh.

4    Q.    Okay.  "It's what she does.  He is the

11:51  5 fourth."  He is the fourth what?

6    A.    The fourth person that she's, from my

7 understanding, that she's left someone for, I guess.

8 That's -- that's what she -- her pattern of behavior is.

9    Q.    And when you say "your understanding,"

11:51 10 what's -- what personal knowledge do you have

11 regarding --

12    A.    I have none.  I've been told.

13    Q.    Told by who?

14    A.    By David and David's mother.  She was adamant

11:51 15 about it.

16    Q.    Okay.

17           MS. PEERY:  And Kyle, can you just scroll

18 down a little bit so we can see the remaining messages

19 on this page?  There we go.

11:52 20    Q.    (By Ms. Peery) "If you have ever -- if you

21 have been intimate with Nate, I would get tested.  Watch

22 out for her."  What do you mean by "If you have been

23 intimate with Nate, I would get tested"?

24           MR. EKELAND:  Objection.  You can answer.

11:52 25           THE WITNESS:  It is -- I was divorced

1  from my kid's dad, Mr. Ross, and the reason was because

2  he was a sex addict.  And so, it's -- it was a very

3  difficult divorce and I always recommend anybody who's

4  been divorced to go get tested because you don't know

11:52  5  what someone is doing.

6        Q.    (By Ms. Peery) Okay.

7              MS. PEERY:  Kyle, can you pull this down

8  and let's bring up Exhibit No. 4?  Can you make it a

9  little bit larger, please?

11:53 10       Q.    (By Ms. Peery) Mrs. Cantu, do you recognize

11  this letter?

12       A.    I do.  That letter was texted to Dr. Guerra by

13  Dr. Cantu at her request after requesting he go down to

14  the DA's office.  That's actually his cell phone shadow

11:53 15  in it and it's in her text messages.  And she said thank

16  you because she required him to go down there in order

17  to see his children.

18       Q.    Was this letter sent to you?

19       A.    I believe it was.

11:53 20       Q.    And this is a letter, the letterhead states

21  Nicholas "Nico" LaHood Bexar County criminal district

22  attorney and it's dated April 13th, 2018, correct?

23       A.    Correct.

24       Q.    It says, "Dear, Ms. Cantu:  A complaint has

11:54 25  been made to this office by Mr. Rodrigo Cantu alleging

1    A.    I have a computer.

2    Q.    Okay.  No iPad?

3    A.    No, I don't need one.

4    Q.    All right.  And you state here you clicked on

12:02  5  the link because you thought it was a business appraisal

6  request?

7    A.    Correct.

8          MS. PEERY:  Kyle, can you scroll down to

9  page eight and paragraph 41?

12:03  10  Q.    (By Ms. Peery) "September 21st, 2018, Spectrum

11  Charter's representatives investigate the persistent

12  internet problems at the Cantu's home.  Representatives

13  examined the Cantu's cable line leading into their house

14  and discovered a cable signal splitter installed on

12:03  15  their line that neither the cable company nor the Cantus

16  put there."  Is that correct?

17    A.    Yes, that is correct.

18    Q.    Do you recall the name of the Spectrum

19  representative that discovered the cable signal

12:03  20  splitter?

21    A.    I do not.  I know that it was a male.  I don't

22  remember his name, but I'm sure it can be searched.

23    Q.    Okay.  Did you take any photographs?

24    A.    He did, yes, because it was not on my

12:04  25  property, it was in the property behind me.  My cable

1  box was away from my house in another property, but it

2  shared four houses.

3       Q.   So, let me dissect that.  He did not find a

4  cable splitter on your property, correct?

12:04  5              MR. EKELAND:  Objection.  You can answer.

6              THE WITNESS:  The cable splitter was not

7  on my property.  It was on the box, the cable box that

8  is shared between four houses.

9       Q.   (By Ms. Peery) So, three other houses have

12:04 10 access to this cable box, correct?

11       A.   One house.

12              MR. EKELAND:  Objection.

13       Q.   (By Ms. Peery) Okay.  One other house has --

14  other than yours --

12:04 15       A.   Right.

16       Q.   Your house --

17       A.   I didn't -- I can't hear you, Brandy, I'm

18  sorry.

19       Q.   Let me finish the question.  Your house --

12:04 20       A.   I'm trying to read your lips and you're off

21  the camera.  Sorry.

22       Q.   Your house and one other house share a cable

23  box --

24              MR. EKELAND:  Objection.  You can answer.

12:05 25       Q.   -- correct?

```
 1      A.    No.   My house and four other houses share the

 2 same cable box.

 3      Q.    Who has access to the cable box?

 4            MR. EKELAND:   Objection.

12:05  5            THE WITNESS:   I don't know.   I did not.

 6      Q.    (By Ms. Peery) But, this is a shared cable

 7 box, so other people can access it, correct?

 8      A.    Nobody --

 9            MR. EKELAND:   Objection.   You can answer.

12:05 10            THE WITNESS:   They're usually -- they're

11 usually locked.   They're the green tower in your yard

12 that you have to mow around or weed eat around.   This

13 particular box was in the house behind me in their yard.

14 So, the other two -- so they -- usually the box is

12:06 15 locked, so I assume it was locked.   And there was this

16 particular time it was not locked and the other two

17 houses that share it in addition to mine and the one

18 behind me do not have access because it's in the person

19 behind me -- behind me, it's in their yard.

12:06 20      Q.    (By Ms. Peery) Okay.   So, it's your testimony

21 that the Spectrum representative took photographs?

22      A.    Uh-huh.

23      Q.    And did he provide these photographs to you?

24      A.    Yes.

12:06 25      Q.    Okay.   And have you produced these
```

1  photographs?

2       A.    Yes.

3       Q.    Are they timestamped?

4       A.    I believe so.  It says the date of

12:06  5  September 21st on it.

6       Q.    But, you did not take any photographs of it

7  yourself?

8       A.    I think I took a photo of his photo, but it

9  was on September 21st, 2018.  We can ask the individual.

12:07 10  I don't remember a lot of that part because it was very

11  upsetting.

12       Q.    Okay.  Did he remove the wire splitter -- I

13  mean, the cable splitter?

14       A.    No, I don't believe he did.  He said that when

12:07 15  he touched it, one of the wires fell off and it was

16  barely connected.  I don't -- I don't believe so.

17       Q.    Okay.  Did he -- did he tell you that it

18  needed to be removed?

19       A.    I don't remember.  I was panicked that it was

12:07 20  there because it shouldn't have been there.  I think we

21  started searching for --

22       Q.    How do you -- how do you know it shouldn't

23  have been there?

24       A.    Well, for my work I have --

12:07 25            MR. EKELAND:  Objection.

1          THE WITNESS:  Sorry.

2          MR. EKELAND:  Go ahead and answer.

3          THE WITNESS:  I have a designated locked

4   line that you can't remove without a special tool, so

12:08  5   that one was not bothered, but for my cable line by

6   itself, it should not have a splitter on it.

7      Q.   (By Ms. Peery) Okay.  But, you're not an

8   expert in cable box installation or cable --

9      A.   He explained -- he explained it to me that

12:08  10   way.

11          MS. PEERY:  Objection, nonresponsive.

12      Q.   (By Ms. Peery) I asked you --

13      A.   No, I'm not an expert.

14      Q.   Okay.  And so, your paragraph 42 says, "A

12:08  15   cable splitter is a type of wiretap that sends data

16   flowing through a cable to more than one recipient."

17   You're not an expert in cable splitters, are you?

18          MR. EKELAND:  Objection.

19          THE WITNESS:  No, I am not.

12:08  20          MR. EKELAND:  You can answer.

21      Q.   (By Ms. Peery) So, you don't know if it should

22   have been there or if it shouldn't have been there?

23          MR. EKELAND:  Objection.  You can answer.

24          THE WITNESS:  There was no record of a

12:08  25   splitter from Spectrum on my cable line.

1  motiva -- motive in participating in allegedly procuring

2  this false police report?

3                      MR. EKELAND:  Objection.  Go ahead and

4  answer.

01:30  5                      THE WITNESS:  I think that they were

6  taking advantage of Dr. Guerra's money.

7      Q.   (By Ms. Peery) Do you have any evidence to

8  support that belief?

9                      MR. EKELAND:  Objection.  Go ahead and

01:30 10  answer.

11                      THE WITNESS:  She submitted a receipt for

12  $3,000 for a 26-page report.  I hardly think that

13  26-page report was worth $3,000.  There had to have been

14  something else.

01:30 15      Q.   (By Ms. Peery) You're not a digital forensic

16  analyst or expert, are you?

17      A.   I didn't --

18                      MR. EKELAND:  Objection.  Go ahead and

19  answer.

01:31 20                      THE WITNESS:  I am -- I am not.

21      Q.   (By Ms. Peery) Okay.  What's the alleged

22  conduct that -- of Dr. Guerra that you allege caused you

23  severe emotional stress?

24                      MR. EKELAND:  Objection.  Go ahead and

01:31 25  answer.

1  As a result of defendant's conduct, plaintiff suffered

2  loss in fees, taxes and penalties for withdrawing money

3  for their retirement funds in order to pay their

4  attorneys' fees; is that correct?

02:04  5        A.    Yes.

6        Q.    Okay.  And that was --

7        A.    I think it's going to be more than 50,000.

8        Q.    And you're -- you're alleging that you

9  caught -- that you suffered these damages solely because

02:04  10  of the conduct of Dr. Guerra and DFC?

11                  MR. EKELAND:  Objection.  Go ahead and

12  answer.

13                  THE WITNESS:  That is correct.

14        Q.    (By Ms. Peery) Mrs. Cantu, have you ever

02:04  15  called Humana to complain about Dr. Guerra?

16                  MR. EKELAND:  Objection.  Go ahead and

17  answer.

18                  THE WITNESS:  I called Humana the first

19  week of April.

02:04  20        Q.    (By Ms. Peery) April what?

21        A.    2018.

22        Q.    What was the purpose for calling Humana?

23        A.    When I messaged her --

24                  MR. EKELAND:  Objection.  Go ahead and

02:05  25  answer.

1           THE WITNESS:  When I messaged her in her

2    profile for Facebook, at the bottom of her profile pic

3    was a lot of data and information, so that was the

4    reason that I called.

02:05  5      Q.    (By Ms. Peery) So, you took it --

6      A.    I think it was proprietary.

7      Q.    So, the Facebook page that you were searching,

8    it appeared to you that there was Humana proprietary

9    information on it?

02:05 10      A.    That is correct.

11      Q.    And you took it upon yourself to call Humana

12    and report it?

13           MR. EKELAND:  Objection.  Go ahead and

14    answer.

02:05 15           THE WITNESS:  Yes, I just said that.

16      Q.    (By Ms. Peery) And what did you tell them?

17      A.    I told them that there was data at the bottom

18    of her Facebook picture.

19      Q.    What kind of data did you tell them it was?

02:05 20           MR. EKELAND:  Objection.  Go ahead and

21    answer.

22           THE WITNESS:  That it appeared to be

23    numbers and spreadsheets.

24      Q.    (By Ms. Peery) Did it have any information on

02:06 25    there that indicated it was Humana numbers and

1  spreadsheets?

2       A.    I don't remember.

3                    MR. EKELAND:  Objection.  Go ahead and

4  answer.

02:06  5                    THE WITNESS:  I don't remember.  I

6  remember Dr. Guerra texting David that the claim was

7  unfounded, that it was -- it was determined unfounded

8  and nothing came of it.

9       Q.    (By Ms. Peery) Who did you speak with at

02:06  10  Humana?

11      A.    I don't remember.

12      Q.    Did you record that conversation?

13      A.    No, I did not.  I believe they did.

14      Q.    You believe they did?

02:06  15      A.    I don't know.  I did not record it.

16      Q.    Okay.  Is that the only time you've called

17  Humana to report anything about Dr. Guerra?

18      A.    That was the only time.

19      Q.    So, you've never called Humana claiming that

02:07  20  Dr. Guerra retaliated against you?

21                   MR. EKELAND:  Objection.

22                   THE WITNESS:  No.

23                   MR. EKELAND:  You can answer.

24      Q.    (By Ms. Peery) Did you sign up Dr. Guerra for

02:07  25  an account or a profile with They Are Positive Singles?